Harold R. CRANSTON et al.,
Plaintiffs-Appellees,

v.

Clifford M. HARDIN, Secretary of Agriculture of the United States,
Defendant-Appellee,

and

Albert Guilian et al., Defendants-Intervenors-Appellees,

Roger L. Noble et al., Appellants,

Laval Bilodeau et al., Appellants,

Charles P. Ryan et al., Appellants.

Nos. 916, 918, 919, Dockets 73–2275, 73–2367, 73–2368.

United States Court of Appeals,
Second Circuit.

Argued June 18, 1974.

Decided Sept. 12, 1974.

Sanford Rosenblum, Albany, N. Y., for appellants Bilodeau and Ryan, and others.

John P. Weatherwax, Troy, N. Y., for plaintiffs-appellees Cranston, and others.

Irwin Goldbloom, Atty., Dept. of Justice (Irving Jaffe, Acting Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., of counsel), for defendant-appellee Secretary of Agriculture.

Frederick U. Conard, Jr., Hartford, Conn. (Coleman H. Casey, Shipman & Goodwin, Hartford, Conn., of counsel), for defendants-intervenors-appellees Guilian, and others.

Charles P. Ryan, Washington, D. C., for appellants Noble, and others.

Caroline Nickerson, Montpelier, Vt., for amicus curiae Vermont Public Interest Research Group, Inc.

William C. Kittell, Burlington, Vt., for amici curiae Alliance of the Northeast Dairyman, National Farmers Organization, and Northern Farms Cooperative Association.

Before SMITH and MANSFIELD, Circuit Judges, and BARTELS, District Judge.*

MANSFIELD, Circuit Judge:

On a previous appeal in this case we held that a provision in the Connecticut Milk Marketing Order, 7 C.F.R. §§ 1015, et seq., permitting "nearby" dairy farmers to receive 46 cents per hundredweight more for their milk marketed in Connecticut than "distant" farmers—i. e., farmers located outside of the market area—was invalid.[1] See Cranston v. Hardin, 428 F.2d 822 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 937, 28 L. Ed.2d 232 (1971). We are now asked to decide whether, on remand, Judge Foley of the Northern District of New York fairly disposed of all funds held in escrow in connection with these proceed-

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. The provision also permitted the "nearby" farmers to receive 23 cents more per hun-

dredweight for their milk than so called "intermediate" farmers—i.e., farmers located outside the market area but nearer than the "distant" farmers.

ings. We hold that he did except in one instance where he charged funds that had been placed in escrow *after* our prior decision was announced with a proportionate share of an award to the "nearby" Connecticut farmers. In all other respects the judgment of the district court is affirmed.

The history of this protracted litigation, which we briefly recapitulate, began in February, 1967, when the action was first brought in the Northern District of New York by six "distant" dairy farmers located in New York (Harold R. Cranston, et al.) against the then Secretary of Agriculture, Orville Freeman. The plaintiffs, who sued on behalf of themselves and all other persons in their class, claimed that the farm location price differential in the Connecticut Milk Marketing Order, 7 C.F.R. § 1015.72 (1968), which became effective in 1959, was not authorized by § 8c(5) of the Agricultural Marketing Agreement Act, 7 U.S.C. § 608c(5) ("the Act" herein). Under the differential provision an amount sufficient to pay the "nearby" farmers 46 cents per hundredweight for their milk was first deducted each month from the monthly pool of milk receipts before distribution of that pool on a pro rata basis to all dairy farmers (nearby, intermediate and distant) selling milk in Connecticut. After three "nearby" farmers (Albert Guilian, et al.) had been permitted to intervene as representatives of their class, Judge Foley of the Northern District ordered that all amounts which plaintiffs and other "distant" farmers would, in the absence of the differential, receive over and above the pro rata share of the pool to which they were entitled be placed in an es-

crow account to be held by the federal Market Administrator for the Connecticut market. These deposits in escrow—totalling approximately $20,000 to $25,000 per month [2]—were continued throughout the earlier stages of the litigation and even, as we shall see below, after this court had held that the differential was invalid.

Prior to trial of the underlying claim, which was assigned to Judge Timbers, then sitting by designation in the Northern District, two members of the plaintiffs' class, Leonard Duncan and Kenneth Hewitt, petitioned to intervene or, alternatively, to have the suit dismissed on the grounds that the suit was collusive. Duncan and Hewitt, who were represented by attorney Charles P. Ryan, claimed that John Weatherwax, counsel for the named plaintiffs, was being paid and controlled by the Consolidated Milk Producers' Association (CMPA), formerly the Connecticut Milk Producers' Association. A large majority of the Association's membership were "nearby" Connecticut farmers. That Association's counsel, Frederick Conard, was also counsel for the defendants-intervenors. After a hearing on the collusion claim and an 11-day trial of the plaintiff's underlying claim, Judge Timbers found "not an iota of credible evidence" that the CMPA, the defendants-intervenors, or the defendant himself "acted or attempted to act, or even desired to act" to control the plaintiff's conduct in the proceedings. He therefore refused to dismiss the action or deny it class action status. Proceeding to the merits, he held that the "nearby" differential was authorized by § 8c(5)(B) of the Act, 7 U.S.C. §

2. In 1967, there were approximately 2,000 "nearby" farmers as compared to approximately 250 "distant" farmers selling milk in Connecticut. Since the monthly deductions made to provide for the 46 cents differential between "distant" and "nearby" farmers had the effect of lowering the uniform pro rata pool price for all farmers in Connecticut, they included, in large part, amounts which the "nearby" farmers would have received even absent the differential. As a result, al-

though the monthly deductions under the differential were approximately $400,000 to $450,000, only $20,000 to $25,000 of this amount would have gone to the "distant" farmers, absent the differential provision. For a more complete account of how the uniform price is ordinarily calculated in a milk marketing area see Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

608c(5)(B), which specifically authorizes adjustments to the uniform price to be paid to dairy farmers for "market . . . differentials customarily applied by the handlers subject to such order." See Cranston v. Freeman, 290 F. Supp. 785 (S.D.N.Y.1968).

Both the named plaintiffs and Duncan, et al. appealed to this court from Judge Timbers' decision. Pending their appeals, the Supreme Court on December 9, 1969, handed down its decision in Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314 (1969). In *Zuber* several Vermont dairy farmers had challenged the validity of the "nearby" price differential in the Massachusetts-Rhode Island Milk Marketing Order, see 7 C.F.R. § 1001.72 (1968). The Supreme Court, upholding judgments of the district and circuit courts invalidating the differential, held that the differential was not authorized by the Marketing Agreement Act since it was not related to any additional economic service performed by the "nearby" farmers. See 396 U.S. at 188, 90 S.Ct. 314. The Court also affirmed the circuit court's final disposition of the funds which had been accumulating in an escrow account during the litigation. The circuit court had held that, although the differential was invalid from its inception, the "nearby" farmers could recover all funds escrowed prior to the district court's decision invalidating it, since "the nearby farmers could legitimately have expected to receive, and the distant farmers to pay, the differential until it has been held invalid, after full opportunity for the presentation of views on both sides, by a court." See Zuber v. Allen, 131 U.S.App.D.C. 109 402 F.2d 660, 676 (1968).

Following the Supreme Court's decision in *Zuber*, the named plaintiffs in the present litigation filed a supplemental brief in this court urging reversal of Judge Timbers' decision in light of *Zuber*. In a lengthy response, however, the Secretary of Agriculture urged that the entire matter should be remanded to him for possible refashioning of the dif-

ferential provision and that, in the meantime, the escrowing should be continued since otherwise market conditions in Connecticut could be seriously disrupted. In an affidavit in support of the Secretary's response, Herbert L. Forest, Director of the Dairy Division, Consumer and Marketing Service, United States Department of Agriculture, predicted that immediate termination of the differential would lead to a substantial increase in the uniform price for "distant" farmers marketing their milk in Connecticut, which would attract more milk than the manufacturing facilities could handle. Two months later, however, on April 1, 1970, the Secretary withdrew his request that the escrowing be continued since none of the parties had submitted a proposal which would effectively deal with the danger of surplus milk. In papers which he filed with this court the Secretary stated:

"After a careful review of the proposals received, the Department of Agriculture has concluded that none of the ones which it believes appropriate subjects for administrative hearings, would be likely to alleviate substantially the problem which prompted the request that the escrowing be continued; i. e., the possibility of a substantial influx of milk into the market for which there are not adequate facilities. Accordingly there are no present proposals before the Secretary which will meet the problem, and no present way of taking substantial appropriate administrative action, with a definite and reasonable time period. In the circumstances, any request for continued escrowing would serve no useful purpose, and therefore the Secretary withdraws the previous request for the continued escrowing."

Agreeing with the Secretary that immediate termination of the "nearby" differential would disrupt the Connecticut market, but disagreeing that none of their proposals could effectively deal with the problem, the "nearby" farmers urged this court to remand to the dis-

trict court with directions either to "enter an order providing for the gradual elimination of the price differential . . . at the rate of 12 cents on the date of its decision, 12 cents as of dates respectfully four and eight months from the date of the decision and 10 cents as of twelve months from the date of the decision," or to conduct hearings "with regard to whether or not such a remedy would be justified in the interests of equity, economic efficiency and the larger public interest." In either event, the "nearby" producers argued, this court should order "continued escrowing of the differential monies pending final termination of the challenged provisions."

In a brief per curiam opinion we on July 16, 1970, affirmed Judge Timbers' rejection of the claim of collusion and his ruling that the suit was maintainable as a class action but, in the light of *Zuber*, reversed his decision upholding the Connecticut differential itself. See Cranston v. Hardin, 428 F.2d 822 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 937, 28 L.Ed.2d 232 (1971). While agreeing that "[j]urisdiction and venue, the propriety of a class action both as to plaintiffs and intervenor-defendants, claims of bias of the Judge, and the questioned adversary nature of the proceedings were all properly resolved by the court," we said that "[i]n view of the *Zuber* decision, the judgment below is reversed and the case remanded to the District Court for such proceedings, including the proper disposition of funds held in escrow during the proceedings and costs and related matters, and the entry of judgment thereon as may be appropriate in the light of *Zuber*." See 428 F.2d at 823.

Still not content to lay their collusiveness claim to rest, appellants Duncan, et al. petitioned for a writ of certiorari from the Supreme Court. In the meantime, back in the Northern District of New York, the "nearby" farmers renewed their request for a gradual "phase out" of the illegal differential and asked the court for a temporary injunction preventing the Secretary of Agriculture from terminating the differential until the phase-out proposal could be considered. Judge Foley granted the temporary injunction on August 5, 1970, and ordered that the payments into escrow be continued. After a series of subsequent meetings both Conard, counsel for the "nearby" farmers, and Weatherwax, counsel for the "distant" farmers who were named plaintiffs, submitted a consent judgment which contained the "nearby" farmers' phase-out proposal.

The proposed judgment was opposed by both the ubiquitous Ryan and by the Secretary of Agriculture who maintained in a legal memorandum prepared by the Department of Justice that the district court had no power on its own to promulgate a new phasing-out differential. At a hearing held on October 14, 1970, Judge Foley did not decide the issue but continued his restraining order to permit Weatherwax to seek clarification from this court as to whether a phasing out of the differential would be permissible. Although present at the hearing, Ryan did not participate. Instead, he submitted his own petition for clarification to this court and asked for an order directing immediate termination of both the differential and the escrowing.

This court did not respond to the petitions for clarification from both Weatherwax and Ryan until after the Supreme Court had on March 1, 1971, denied Ryan's petition for certiorari with respect to the collusiveness claim. Several months before that time, however, on November 1, 1970, the H.P. Hood Milk Co. moved one of its plants from Agawam, Massachusetts, into Connecticut. As a result of this move, approximately 350 dairy farmers (the "Agawam group" herein) who were located in Vermont, Massachusetts and Rhode Island and who had previously been marketing their milk in Massachusetts, began marketing milk as "distant" farmers in Con-

necticut. This influx more than doubled the size of the plaintiffs' class and more than tripled the monthly payments into escrow, which still represented monies that "distant" farmers selling milk in Connecticut would be receiving without the illegal differential.

On April 13, 1971, this court "clarified" its previous decision by directing the district court to "order the nearby differential terminated forthwith." In response to our direction, the district court terminated its restraining order against the Secretary of Agriculture, ordered an immediate end to the differential and escrowing, and asked the parties to prepare a final consent judgment disposing of the funds accumulated in the escrow account. During the next few weeks the named plaintiffs, plus an informal committee of 12 other members of their class, together with their attorney, Weatherwax, met with the defendants-intervenors and their attorney, Conard, and on May 19, 1971, submitted to the court a proposed consent judgment which would distribute the entire fund to all the "distant" farmers less: (1) $25,000 to the Market Administrator as escrow agent; (2) $175,000 to the "nearby" farmers and $242,300 to their attorney Conard for fees and disbursements; and (3) $275,000 to attorney Weatherwax for fees and disbursements.

At this time there was approximately $1,600,000 in the escrow fund. The awards would be charged against the entire escrow fund—i. e., they would reduce proportionately the returns of all the "distant" farmers, including the Agawam group who joined the plaintiffs' class only after the differential had been declared illegal. In an order entered the same day, May 19, the district court directed that upon appropriate notice by the Market Administrator to all members of the plaintiffs' and defendants-intervenors' classes, a hearing would be held on the proposed judgment on June 7, 1971.

Prior to the hearing several persons, including the Attorney General of Vermont and an attorney named Reuben Hall, all of whom claimed to represent various members of the Agawam group, moved to intervene on the grounds that the Agawam group had a separate interest in receiving its escrow funds free of any charges for costs, attorneys' fees or award to the "nearby" farmers. Additionally Ryan and his associate Sanford Rosenblum of Albany, New York, sought to have the hearing delayed or cancelled so that they might obtain a list of farmers for the purpose of developing additional opposition to the judgment. Despite these efforts, which included a petition for mandamus that was denied by this court on the day of the hearing, the hearing was held as scheduled and thereafter the district court received briefs from all parties wishing to file them as well as a second legal memorandum from the Secretary of Agriculture, again drafted by the Department of Justice, asserting that the court had the power to charge a proportionate share of the costs of litigation and other awards to funds that were escrowed even after this court had held the differential invalid.

More than two years later, on July 26, 1973, the district court announced its decision, which adopted the proposed consent judgment insofar as it charged costs of litigation and the award to "nearby" farmers against all the funds in the escrow account, including the funds belonging to the Agawam group. The court held that it had the power to preserve the *status quo* and continue the escrowing even after this court had declared the price differential invalid, pending its good faith consideration of the parties' phasing-out proposal. Moreover, the court considered it equitable to charge the latecomers with a proportionate share of the costs of litigation and other awards since they had benefited from the litigation as much as anyone else in the plaintiffs' class. As for the amount of the awards themselves, the court reduced the award to the Market

Administrator from $25,000 to $10,000, retained the award of $175,000 to the "nearby" farmers but reduced the award of fees and disbursements to Conard from $242,300 to $200,000, which the court directed to be paid to Yankee Milk, Inc., the successor of CMPA which had already paid Conard's fees, and reduced the award of fees and disbursements to Weatherwax from $275,000 to $230,000. The court did not approve any award for fees or disbursements to attorney Ryan or any of his associates. The remainder of the fund—approximately $1,430,000 —was to be paid to all "distant" farmers according to their proportionate share of the milk marketings during the entire period.[3]

More than 150 of the plaintiffs' class of "distant" farmers, most of whom are members of the late arriving Agawam group, are now appealing from the district court's judgment. They are supported by the Alliance of the Northeast Dairyman, the National Farmers Organization, and the Northern Farms Cooperative Assocation, who have submitted a joint brief as amici curiae, and by Vermont Public Interest Research Group, Inc., which has also submitted an amicus brief. Attorney Ryan and his associates have also appealed from the district court's failure to award them attorneys' fees and disbursements.

## DISCUSSION

### I.

We start with the district court's order restraining the Secretary of Agriculture from terminating the price differential immediately after this court had declared it invalid on July 16, 1970, and then charging funds collected after that date with a proportionate share of the awards approved for the costs and expenses of the entire litigation and for the "nearby" farmers. Appellants Noble, et al., who are members of the Aga-

wam group, argue that the district court had no power to restrain the Secretary from terminating the differential after it had been declared illegal and that, even if it did, the restraint was arbitrary and capricious since the proposed phasing out of the differential, which the district court allegedly needed time to consider, was patently illegal and unwarranted by market conditions in Connecticut. Additionally, several amici curiae argue that it was unfair to charge the Agawam group, which entered the Connecticut market only after the differential had been declared illegal, with a proportionate share of the named plaintiffs' costs throughout the entire litigation as well as of the award to the "nearby" farmers, which included a large amount for their costs of litigation.

With the benefit of hindsight we find —as appellants argued below—that the district court's prolonged consideration of the parties' "phase-out" proposal in lieu of immediate termination was not warranted by market conditions in Connecticut. Final elimination of the differential has not disrupted marketing or produced a new flood of milk from "distant" producers seeking the higher uniform price. However, no reason is shown why the lack of probable disruptive effect should have been obvious to the district judge on August 5, 1970, when he issued the restraining order which was designed only to preserve the *status quo* pending the court's further study of possible legal and economic justification for a gradual elimination of the differential. Only a few months earlier, the Secretary of Agriculture himself had urged a temporary continuation of the differential and escrowing based on the Forest affidavit, which warned that abrupt termination of the differential "would cause a substantial dislocation of milk supplies from their normal marketing channels by moving

---

3. Actually Judge Foley directed that the total period of escrowing be subdivided into the period from February 1, 1967, through October 31, 1970, and the period from No-

vember 1, 1970, through March 31, 1971. Distribution to each "distant" farmer would be based on his proportionate share of the total milk marketed during the period.

more milk into Connecticut [with] several results detrimental to orderly milk marketing in Connecticut." Forest said that "The likely prospect, if the present escrowing arrangement is abruptly terminated and the distant zone prices increased 43.5 cents . . . is a sudden influx of milk into Connecticut followed by a reverse flow as facilities become overtaxed and the uniform blended price is reduced. This effect would disserve the orderly flow of milk to this market, and undermine the effectiveness of [the Connecticut Order] in ensuring reasonably stable market conditions." When the Secretary later withdrew his request for continued escrowing, it was not because he had discovered that the danger of disruption was more imagined than real, but because "there are no present proposals before the Secretary which will meet the problem."

Adoption of the parties' proposal for a gradual elimination of the illegal differential was not clearly beyond the jurisdiction of the district court, which is vested with broad discretion to frame decrees adopting flexible remedies for statutory or even constitutional violations of long standing. Cf. Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955); United States v. DuPont, 366 U.S. 316, 322–323, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961); Vulcan Society of the New York City Fire Department v. Civil Service Commission, 490 F.2d 387, 399 (2d Cir. 1973); Rios v. Enterprise Association Steamfitters Local 638 of U.A., 501 F.2d 622 (2d Cir. 1974). Nor do we agree that anything in the decision of this court on July 16, 1970, clearly prohibited the gradual rather than abrupt termination of the differential. While a proposal for gradual phasing out of the differential had been submitted to this court prior to its July 16, 1970, decision, our failure to order the district court to

adopt it was consistent with the well-settled rule that the "framing of decrees should take place in the District rather than the Appellate Courts." See International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Chance v. Board of Examiners, 458 F.2d 1167, 1178 (2d Cir. 1972).

■ Thus the question of the district court's power to order a gradual elimination of the price differential was far from frivolous. There was highly respected opinion, based on experience in marketing of milk, that a gradual elimination would best serve the purposes of the Agriculture Marketing Agreement Act. Under these circumstances the district court had jurisdiction to preserve the *status quo* pending its consideration of the phase-out proposal. See United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Chicago & North Western Railway Co. v. United Transportation Union, 471 F.2d 366 (7th Cir. 1972). In essence, the court was dealing with a question of first impression amidst expert predictions of seriously harmful consequences if it should fail to provide for gradual relief. Under these circumstances, the court "could make appropriate orders so as to afford the necessary time for fair consideration and decision while existing conditions were preserved." See United States v. United Mine Workers, *supra*, 330 U.S. at 310–311, 67 S.Ct. at 704 (Frankfurter, J., concurring). The Secretary of Agriculture, who strenuously opposed the district court's power ultimately to order the phasing out of the differential on its own, has conceded as much.[4] We therefore hold that the district court had power to enter the order of August 5, 1970, and to continue it on October 14, 1970, in order to preserve the *status quo* pending the district court's consideration of the proposed phasing out of the

---

4. Rather than a "flip-flop," as vehemently charged by appellants Noble, et al., the Secretary's positions here have been entirely consistent. Although asserting that the district court had no power to order him to terminate the differential gradually, the Secretary later agreed that the district court could at least maintain the status quo while considering the question of its power.

differential and possible clarification by this court.

■■■ We also find no inequity in requiring members of the Agawam group to pay a proportionate share of the fees approved for Weatherwax, the counsel for the named plaintiffs, and for the Market Administrator as escrow agent. Although latecomers, the members of the Agawam group obtained the "full benefit" of the services for which these fee awards were made. See Mills v. Electric Auto-Lite Co., 396 U.S. 395, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969). However, we can see no similar reason for charging members of this group with a proportionate share of the award to "nearby" farmers, or to their counsel, Conard (which should be viewed as part of an overall award to the "nearby" farmers). Justification for this overall award could only lie in the "distant" farmers' long acquiescence in the "nearby" differential and accompanying reliance on it by the "nearby" farmers. See Blair v. Freeman, 370 F.2d 229, 239–240 (D.C.Cir. 1966); Zuber v. Allen, 402 F.2d 660, 675–676 (D.C.Cir. 1968), aff'd, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). Here the late arrival of the members of the Agawam group precluded their acquiescence in a differential which did not affect them. Absent this acquiescence, there was no basis for charging them with a proportionate share of the award to "nearby" farmers. We therefore hold that so much of the district court's judgment as charged members of the Agawam group with a proportionate share of the award to "nearby" farmers, including the award to their counsel, Conard, is reversed.

## II.

■ The members of the Agawam group contend that they were denied due process by the district court for the reason that, following their entry into the Connecticut market on November 1, 1970, the court failed to give them formal notice of the status of the class action, see Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968), and failed to conduct an inquiry to determine whether they, as new members of the "distant" farmers class, would be adequately represented by the named plaintiffs and their counsel. The Agawam producers now assert that a conflict of interest existed between them, on the one hand, and the named plaintiffs and older "distant" farmers, on the other, since by the time of the Agawam group's entry into the Connecticut market we had already on July 16, 1970, invalidated the "nearby" farm location differential, with the result that the Agawam group's interest lay in immediate termination of the differential, whereas the older members of plaintiffs' group favored continuation of escrowing as a means of forcing the new "distant" farmers to share financial burdens which they would escape if escrowing were terminated at once, i. e. (1) a share of the $375,000 to be paid to the "nearby" farmers and their counsel, and (2) a share of Weatherwax's fee and expenses. In view of this asserted conflict of interest the Agawam group contends that the district court was under an obligation not only to give "formal notice" to its members but to designate subclasses under Rule 23(c)(4), F.R.Civ.P. We disagree.

The claim of conflict of interest turns out to be more illusory than real. To the extent that the alleged conflict is based upon the district court's order charging the Agawam group with a share of the award to "nearby" farmers and their counsel, it has been mooted by our reversal of that part of the district court's order. We furthermore find no merit in the remaining asserted basis of conflict, i. e., the alleged use of the compromise phase-out arrangement as a means of forcing the Agawam group to share Weatherwax's fee and expenses. If the older "distant" farmers had had their way, they would have terminated the differential at once. However, they then would have risked the possibility that the "nearby" farmers would have

been awarded a much larger share of the escrow fund than they received under the compromise. In either event, however, the Agawam group benefited directly from Weatherwax's services, which were rendered in the interest of all "distant" producers, both old and new. Due in large measure to his efforts thé members of the Agawam group received a higher price for their milk than they would otherwise have received.

■ Turning to the question of what notice of the pendency of this action was required to be given to the Agawam group, if the group, in arguing that its members were entitled to "formal" notice, means individual notice to each member, the simple answer is that although Rule 23(c)(2) specifically mandates that in a suit under Rule 23(b)(3) the court must direct to members of the class "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," see Eisen v. Carlisle & Jacquelin et al., 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), individual notice is not necessarily required in a suit under Rule 23(b)(1)(B), such as the present action. In actions under (b)(1) and (b)(2) it is sufficient if the notice is reasonably calculated to apprise the members of the pendency of the action. In the present case this standard was clearly met.

■ Prior to November 1, 1970, the pendency of the present action and the continuation by Judge Foley of the escrowing arrangement had been the subject of newspaper publicity in the northeast and of reports by major northeastern cooperatives, including the Connecticut Milk Market Administrator, to their members. Having shared in the distribution of the court-created fund in Freeman v. Allen, 131 U.S.App.D.C. 109, 402 F.2d 660 (1968), the members of the Agawam group, although newcomers in Connecticut, were undoubtedly well aware of the significance of the *Cranston* suit and the escrow fund established by the district court's order. Beginning in early 1971, furthermore, Weatherwax sent out "information letters" to members of the Agawam group, advising them of the progress of this case, the status of plaintiffs' application to this court for a clarification of its power to adopt a "phase-out" method of terminating the differential, and of our April, 1971, order that the escrowing arrangement be terminated. Finally formal notice was given to members of the Agawam group, pursuant to Rule 23(e), F.R.Civ.P., of the hearing to be held by the district court on June 7, 1971, to consider approval of the proposed consent judgment, at which Agawam producers appeared and were heard.

In short, the members of the Agawam group were fairly apprised of their inclusion in the group and of the proposed compromise, and they were adequately represented in the negotiation of the compromise. They were not denied due process.

### III.

We turn next to the several attacks made by appellants Bilodeau, et al., many of whom have been members of the plaintiffs' class since the litigation's inception, on the size of the awards which the district court approved from the fund before distributing the remainder to the "distant" farmers. These appellants say that the "nearby" farmers should not have taken anything from the fund since they had not actually relied on the differential which gained them only two cents more per hundredweight than they would have been receiving without it,[5] and since their representatives had been responsible for inordinate delays throughout the proceedings with the design of building up the fund. They also question the amount of the attorneys' fees awarded to Conard who,

---

5. See note 2 *supra*. The small amount which the "nearby" farmers were actually gaining under the differential was due to the fact that there were many more "nearby" than "distant" farmers selling milk in Connecticut.

they say, actually lost the litigation, and to Weatherwax who, they allege, was not working on a contingent fee basis and had the benefit of the Zuber v. Allen decision and all the accompanying legal briefs which he could copy. Attorney Ryan and his associates also argue that they should have been awarded fees and expenses since they had performed services "that were absolutely essential and necessary" for the protection of the "distant" farmers.

All the awards finally approved by the district court were proposed by the parties themselves, including the Secretary of Agriculture, after a series of negotiations which, according to Judge Foley, were conducted at arm's length. Before approving these awards the district court held a hearing pursuant to formal notices that had been sent to all members of the plaintiffs' and defendants-intervenors' classes. These notices stated that:

> "[A]ny member of either the plaintiffs or defendant-intervenors' classes, or any person a real party in interest in this litigation, may appear in person or by attorney duly qualified in accordance with the Rules of this Court, and present to this Court his or her position on or with respect to said Proposed Judgment or any part thereof, or as to any other related matter under consideration by the Court on this hearing."

At the hearing itself no one opposed the size of the proposed award to the "nearby" farmers. Reuban Hall and Theodore Corsones, purporting to represent various members of the Agawam group, and two attorneys for the State of Vermont maintained that the Agawam group should not be charged with a proportionate share of this award or with any of the costs of litigation. The only other opposition to the proposed judgment came from two "distant" farmers who were present and from Sanford Rosenblum, the associate of Ryan, who argued that the proposed fees for Weatherwax and Conard were excessive in view of the amount of the entire fund, the value of their services and the delaying tactics they deliberately followed. At the close of the hearing, the district court invited all interested parties to submit briefs in support of any objections they might have.

■■ Where, as here, a trial court has approved a settlement after allowing prospective objectors adequate notice and opportunity to develop in the record facts going to the propriety of the settlement, appellate courts have been reluctant to interfere except upon a "clear showing of abuse of discretion." See Newman v. Stein, 464 F.2d 689 (2d Cir.), cert. denied sub nom., Benson v. Newman, 409 U.S. 1039, 93 S.Ct. 521, 34 L. Ed.2d 488 (1972); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied sub nom. Cotler Drugs v. Chas. Pfizer & Co., 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); Ace Heating and Plumbing, Inc. v. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971); United Founders Life Insurance Co. v. Consumers National Life Insurance Co., 447 F.2d 647, 655 (7th Cir. 1971). We find no such abuse here, at least insofar as the district court permitted the "nearby" farmers to recover a total of $375,000—which included $200,000 for Conard—of the $1,815,000 which was in the fund at the time of distribution. This amount—$375,000— was far less than that which was in the account at the time of the Supreme Court's decision in Zuber v. Allen— $817,128—or at the time of this court's decision declaring the Connecticut differential invalid in the light of *Zuber*— $1,009,119. Under the circuit court's decision in Blair v. Freeman, *supra*, and in Zuber v. Allen, *supra*, the district court might well have awarded the "nearby" farmers these greater amounts.

While we might agree with appellants that there was less reliance on the differential by the "nearby" farmers here than in *Zuber* since here the differential increased the price which the "nearby" farmers would realize by only two cents

per hundredweight whereas in *Zuber* the increase to the "nearby" farmers was thirteen cents, still, as in *Zuber*, the "nearby" farmers "could legitimately have expected to receive, and the distant farmers to pay, the differential until it has been held invalid, after full opportunity for the presentation of views on both sides, by a court." See Zuber v. Allen, 402 F.2d at 676. Moreover, it would have been highly inequitable to punish the "nearby" farmers alone for the length of the proceedings. Even if their representatives, the defendants-intervenors, had been solely responsible for the delays, which they clearly were not, the district court, which was "exposed to the litigants, and their strategies, positions and proofs," see Ace Heating and Plumbing, Inc. v. Crane Co., 453 F.2d at 34, found that they and their counsel, Conard, had acted in good faith and not for purposes of delay.

■ Nor do we think that the fees approved for Conard and Weatherwax were excessive when judged in the light of their skill and experience in this type of litigation, their standing at the bar, the magnitude and complexity of the litigation, the responsibility assumed by them in the case, and the number of hours of professional time expended by them in the good faith performance of their duties. See City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974); Lindy Brothers Builders Inc. v. American Radiator and Standard Sanitary Corporation, 487 F.2d 161 (3d Cir. 1973). Both Judge Timbers and Judge Foley, who were best "situated to appraise the worth of counsel's services in providing assistance in the salient decision making," see Freeman v. Ryan, 408 F.2d 1204, 1206 n. 4 (D.C.Cir. 1969), had high praise for the skill and conduct of Conard and Weatherwax. Judge Timbers wrote that

"Attorney Weatherwax, at all times had conscientiously, expertly and with the highest professional sense of duty to plaintiffs endeavored to represent their interests. Attorney Weatherwax has forthrightly, earnestly, and unceasingly prosecuted this lawsuit to enjoin the application of the differentials. He has conducted his case as any gentleman and lawyer should and would and has never conceded a point nor failed to present a plausible argument." 290 F.Supp. at 789.

Judge Foley concurred and added that the "experience of Attorney Conard is evidenced by his participation in the District of Columbia cases, similar to this case, and also by the able and scholarly presentation of viewpoints in this Cranston action."

Moreover, prior to the July 7, 1971, hearing on the proposed judgment embodying the settlement, attorney Conard submitted an affidavit stating that he and his associates had spent 4,927 hours on this litigation, which had already been billed to the CMPA. Attorney Weatherwax submitted a similar affidavit stating that he and his associate James M. Strang had spent 3,811 hours on the litigation. These figures were not contested at the hearing and have obviously been increased by work spent since that time. While, unfortunately, the affidavits did not give a detailed breakdown of the way in which the hours had been spent and by whom in each instance, see City of Detroit v. Grinnell Corp., *supra,* the district court knew the history of the litigation, had observed both Conard and Weatherwax before him, and was familiar with all the pleadings, records, briefs and documents which had been filed. From all of this, the court could conclude that few of the hours listed had been spent "on comparatively routine matters or in ministerial duties." See City of Detroit v. Grinnell Corp., *supra,* 495 F.2d at 473. Dividing the hourly figures contained in the affidavits—which, as we have said, represent only time spent before the July 7, 1971, hearing—into the amounts ultimately awarded—$185,000 for Conard (plus $15,000 for disbursements and

expenses) and $205,000 for Weatherwax (plus $25,000 for disbursements)—the resulting hourly fees, to the extent that they represent one factor to be considered in determining the fairness and adequacy of the fee allowances, are clearly within reasonable bounds.

Conard did not "lose" the litigation in all respects since he initially prevailed in the proceedings before Judge Timbers and later successfully asserted the "nearby" farmers' claim to part of the escrow fund which had been accumulated. Either he or the persons who paid him were entitled to be paid out of the sum awarded to "nearby" farmers for litigation expenses incurred in creating that fund.[6] See Mills v. Electric Auto-Lite Co., *supra;* Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). Nor do we consider it material that Weatherwax may not have been participating under a contingent fee arrangement since this was not the basis of the district court's award.[7] The principal factors considered by the court, including the hours spent, the skill and experience of Weatherwax and the type of functions he performed, which included representation at numerous hearings, an 11-day trial before Judge Timbers,[8] numerous appeals and lengthy negotiations, amply supported the size of the award.

The district court also properly considered the size of the "distant" farmers' recovery and the fees which had been awarded in the *Blair* and *Zuber* cases. See United States v. American Society of Composers, A & P, 466 F.2d 917, 919 (2d Cir. 1972); Johnson v. Georgia Highway Express, Inc., 488 F. 2d 714, 718 (5th Cir. 1974). In *Blair,* attorneys of the "distant" farmers were ultimately awarded $185,000 plus "out of pocket expenses of a kind customarily reimbursed to counsel." See Freeman v. Ryan, *supra.* In *Zuber,* attorneys for the "distant" farmers were awarded $750,000. See Allen v. Hardin, Civ.No. 3379–66 (D.D.C. Apr. 23, 1970). Appellants' presumptuous assertion that Weatherwax had been able to copy the papers which were filed in these preceding cases overlooks the lament of the circuit court in those cases that "a significant aspect of the research required for [the court's decisions]" had to be undertaken by the court itself. See Freeman v. Ryan, *supra,* 408 F.2d at 1206.

Attorney Ryan and his associates were not counsel to any of the named parties in this litigation and conferred no significant benefit on any class of private persons involved. To the extent that Ryan and his associates were responsible for the Supreme Court decision in Zuber v. Allen, which, they claim, "dictated the reversal of this case and the reversal of Judge Timbers," they have already been adequately com-

---

6. Appellants' argument that the award for Conard's fees and disbursements should have been denied since CMPA is no longer in existence but had merged with United Milk Producers of New England and the New England Milk Producers Association to form Yankee Milk, Inc., is frivolous. The members of the CMPA who, presumably, are now members of Yankee Milk, were still entitled to reimbursement for the benefits they had conferred.

7. The issue of whether or not Weatherwax was participating on a contingent fee basis was hotly disputed at the oral argument of these appeals and may turn on reasonable differences as to the interpretation of Weatherwax's apparently informal agreement with his clients.

8. Pointing to the absence of any trial in the *Zuber* case where the district court proceeded on motions for summary judgment, appellants vigorously assert that the trial before Judge Timbers was unnecessary. This argument overlooks the multiple grounds on which the Connecticut differential was attacked, including the ground that the differential was presently operating as an impermissible trade barrier in violation of § 8c(5)(G) of the Act, 7 U.S.C. § 608c(5)(G). Since Judge Timbers did not agree with this contention, a trial was necessary before he could dispose of the plaintiffs' several other claims.

pensated since, as we have already noted, they were awarded $750,000 in that case. It is a novel assertion that attorneys who are victorious in one case may, like the holder of a copyright, claim fees from all subsequent litigants who might rely on or use it in one way or another. Nor was Ryan solely responsible for the termination of the differential and escrowing pursuant to this court's clarification of its July 16, 1970, decision, or the abandonment of the proposed gradual elimination of the differential. An order requiring the gradual elimination of the differential was vigorously opposed by the Secretary of Agriculture on jurisdictional grounds and Ryan's petition for clarification in this court merely preceded Weatherwax's petition, which was submitted at the direction of the district court.

Instead of conferring substantial benefits in this case, Ryan's efforts which the district court, echoing the circuit court in Freeman v. Ryan, described as "voluminous, repetitious, accusatory and petulant," substantially increased expenses. Thus, for example, Conard and Weatherwax were required to spend several days responding to Ryan's collusion charges in the district court, in this court and in the Supreme Court, although Judge Timbers found "not an iota of credible evidence" to support the charges. See 290 F.Supp. at 789. In opposing virtually every effort to move the litigation forward, Ryan freely imputed evil motive to the parties and their attorneys, including representatives of the Department of Justice, and to Judges Timbers and Foley. This conduct deserves no reward. Accordingly we affirm the district court's refusal to award attorneys' fees to Ryan or his associates and endorse his words.

The judgment of the district court is affirmed in part, reversed in part and remanded to the district court for further proceedings consistent with this opinion.