| Civil Docket Number | Currently Assigned Judge |
|---|---|
| 91–2079 | Hurley |
| 91–2795 | Korman |
| 91–2796 | Amon |
| 91–3172 | Amon |
| 91–3174 | Raggi |
| 91–4168 | Dearie |
| 92–0034 | Sifton |
| 92–0040 | Dearie |
| 92–0870 | Dearie |
| 92–0872 | Weinstein |
| 92–1266 | Hurley |
| 92–2221 to 92–2252 | Weinstein |

So ordered.

**In re GULF OIL/CITIES SERVICE TENDER OFFER LITIGATION.**

**W. ALTON JONES FOUNDATION, Wenonah Development Company, Foster and Foster, and Foster Bam and Alma Foster Davis, Both Individually and as Trustees for Four Testamentary Trusts Under the Wills of Fannie Estelle Foster, Millicent F. Foster, Sylvester M. Foster, and Warren W. Foster, Plaintiff,**

v.

**CHEVRON U.S.A. INC., f/k/a Gulf Oil Corporation, Defendant.**

**Nos. 82 Civ. 5253 (MBM), 87 Civ. 8982 (MBM).**

United States District Court, S.D. New York.

May 21, 1992.

Stephen D. Oestreich, Wallace A. Showman, Wolf, Popper, Ross, Wolf & Jones, New York City, Berger & Montague, Philadelphia, Pa., Bizar D'Alessandro Shustak & Martin, Wechsler, Skirnick, Harwood, Halebian & Feffer, Kaufman, Malchman, Kaufman & Kirby, Lowey, Dannenberg, Bemporad & Selinger, P.C., New York City, for Class Action plaintiffs.

Thomas Moreland, Jeffrey S. Trachtman, Ross N. Herman, Paul F. Occhiogrosso, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Alton Jones plaintiffs.

John W. Castles 3d, Banks Brown, Frederic W. Parnon, William Purcell, John D. Henderson, Robert A. Becker, Lord Day & Lord, Barrett Smith, New York City, John S. Athens, Conner & Winters, Tulsa, Okl., John E. Bailey, Chevron U.S.A., Inc., Houston, Tex., William P. Casella, Narrowsburg, N.Y., for defendants.

David J. Eiseman, Golenbock, Eiseman, Assor & Bell, New York City, for objectors Charles J. Waidelich and Charles V. Wheeler.

## OPINION AND ORDER

MUKASEY, District Judge.

This case is before the court to resolve the objections of Charles J. Waidelich and Charles V. Wheeler to the proposed class action settlement and, if those objections are found insufficient to warrant rejecting the settlement, to treat class counsel's fee application. No timely objection has been raised to the fee application itself, although one letter from a class member that can be interpreted as such an objection was received on March 31, 1992 and is discussed in section IV below. For the reasons set forth below, the Waidelich and Wheeler objections are overruled, the class action settlement is approved, and the fees of class counsel are fixed in the amount set forth in the order accompanying this opinion.

### I.

As recited extensively in a prior opinion reported at 725 F.Supp. 712 (S.D.N.Y.1989), familiarity with which is assumed, this case arises from an abortive tender offer in June 1982 by Gulf Oil Company for the stock of Cities Service Company. The surviving class claims in this case arise from the allegation that on or about July 13, 1982 Gulf changed its corporate mind about the desirability of going forward with the tender offer, but did so for reasons that would not permit Gulf to withdraw from

the applicable agreements. Class plaintiffs charge that Gulf then fraudulently failed to disclose that fact, and instead undertook to sabotage the deal by fomenting a confrontation with the Federal Trade Commission and then arguing that the FTC's position in the resulting litigation permitted Gulf to withdraw pursuant to the terms of the applicable agreements. This course of conduct by Gulf is alleged to violate § 15 of the Offer to Purchase, as well as §§ 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e). *See* 725 F.Supp. at 718–27, 738–43, 748–50, 754.

Gulf has interposed two defenses of note, both arising from allegedly inadequate disclosures by Cities in connection with the proposed transaction which, when discovered, arguably would have allowed Gulf to withdraw. One is that Cities failed to disclose a substantial potential liability to the Department of Energy ("DOE"); the other is that Cities materially overstated its oil and gas reserves.

Waidelich and Wheeler filed their objections on March 10, 1992, the last day for filing such objections, and did so with substantial assistance from counsel for plaintiffs Foster Bam and others who previously had opted out of the class. The objectors and opt-out plaintiff Bam had significant roles in the underlying events. Waidelich was the chief executive officer of Cities, Wheeler was its general counsel and Bam was a director of Cities and chaired its audit committee.

At the time the objectors made known their opposition to the settlement, the case had been divided into three potential trials: (i) Gulf's liability based on its undisclosed change of position; (ii) Gulf's defenses (if necessary); and (iii) damages (if necessary). The trial of Gulf's liability was scheduled to begin on March 24. The other trials had not been scheduled, and discovery as to certain issues relating to those trials, particularly Gulf's defense based on Cities' alleged overstatement of reserves, was not yet complete.

## II.

The objectors contend that if the class were successful at trial, its members would recover approximately $30 per share, and that the proposed settlement will yield only a hundredth of that, or about 30 cents per share, a discount they believe unwarranted "considering that the class has the opportunity to obtain full recovery, plus interest, in a relatively brief period of time by proceeding to trial." (Waidelich Aff. ¶ 6) Needless to say, they believe firmly in the strength of class plaintiffs' position, as enhanced in their view by the force and credibility of their own proffered testimony. (Waidelich Aff. ¶ 7; Wheeler Aff. ¶ 6)

To explain why class counsel on the eve of so swift, certain and profitable a victory would slink from the field with so little booty, the objectors casually offer the accusation, with no supporting evidence and after declining the offer of an evidentiary hearing (3/18/92 Tr. at 4), that class counsel sold out their clients' interest for lucrative fees based on "a wink and a nod" exchanged with defense counsel. (Objectors' Mem. at p. 22)

The objectors' arithmetic is deficient, although, as explained below, not nearly as deficient as their logic, their history and, if there is anything to Gulf's defenses, their deportment as well. The class stands to recover some $18.4 million of the settlement proceeds after fees and expenses; the tender offer was for 41.5 million shares, from which must be subtracted the shares held by the opt-out plaintiffs, which leaves about 38 million shares. That yields a recovery of a bit more than 48 cents per share, payable in the proportion that the shares tendered by each member of the class bear to 41.5 million, assuming that all tendered shares are the subject of valid proofs of claim.

■ Before dealing with the objectors' remaining arguments, it is useful to recall the legal standard that governs a proceeding of this kind. The law favors settlements, of class actions no less than of other cases. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982). Moreover, "that a proposed settlement may only amount to

a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 455 (2d Cir.1974).

The Court in *Grinnell* listed with approval nine factors considered by the district court in that case before it approved the settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (citations omitted). Of those factors, the last appears to be the end product of the other eight, and thus should not count as a separate factor. Of the remaining eight, the last three—the risks of maintaining the class action through the trial, the ability of the defendants to withstand a greater judgment and the range of reasonableness of the settlement fund in light of the best possible recovery—appear to favor the objectors, but they are hardly the most significant factors. With respect to the factor the objectors stress most—the alleged imbalance between the settlement and the possible recovery—the Court in *Grinnell* said specifically that "there is no reason ... why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n. 2.

■ As discussed below, all the remaining factors favor the settlement; the numbers correspond to the factors listed in *Grinnell*.

## 1. Complexity, Expense and Likely Duration of Litigation

Despite the objectors' facile assumption to the contrary, the trial as to Gulf's liability would not end the litigation. Apart from the trial itself, and post-trial motions of every description, the most optimistic scenario from the objectors' standpoint would require the parties to conduct two additional trials, relating to Gulf's defenses and to damages, each with its attendant pretrial order, laborious winnowing of proof before trial, and post-trial skirmishing.

This prospect undermines also the logic of the objectors' assertion that class counsel betrayed their clients in order to obtain fees. If class counsel could be as certain as the objectors claim of a sizeable recovery, then whether a percentage-of-the-fund or lodestar calculation is applied, they would have every incentive to keep the litigation going in the hope of raising their own fees.

## 2. Reaction of the Class to the Settlement

The reaction of the class to the settlement has been positive, other than the opposition filed by the objectors and one letter received after the time for filing objections that echoed faintly the objectors' position.

## 3. Stage of the Proceedings

The stage of the proceedings is such that the facts have been substantially developed and it is possible to form an intelligent judgment about the likely success of class plaintiffs' case. The compromise reached by class counsel has been neither arbitrary nor premature, but formed after careful investigation and weighing of facts generated over years of discovery and after having to array many of those facts for presentation at trial by crafting a detailed pretrial order for the liability trial.

## 4. Risks of Establishing Liability

The risks of establishing liability are considerable. Despite the objectors' expressed confidence, "hardly powerful" still seems a

**592**

fair if not quite felicitous description of plaintiffs' proof on the issue of Gulf's liability. 725 F.Supp. at 741. Gulf is prepared to offer at trial an array of witnesses and other proof supporting its good faith in maintaining that Cities' Lake Charles facility was a material asset within the meaning of the relevant agreements, and that it negotiated with the FTC in an effort to prevail, not simply to provoke.

But beyond the issue of liability in relation to Lake Charles lie Gulf's affirmative defenses. One of those defenses, that Cities inflated the value of its reserves, will be decided in what promises to be a tedious and often impenetrable swearing contest between teams of geological experts. How a jury will react to such evidence is highly problematic. The other defense, however, looks like it could have considerable jury appeal, involving as it does claims of corporate skulduggery supported by evidence readily comprehensible to the lay mind.

In the period October 1979 through January 1981, there was available in the oil market crude oil that was subject to DOE price controls and crude oil that was not. During that period, Cities had 91 transactions with alleged resellers of crude oil in which Cities purported to sell price-controlled crude oil, and to buy about the same volume and type of oil that was certified by DOE as not price-controlled ("certified oil"). In each of these transactions Cities paid more for the certified oil it bought than it received for the price-controlled oil it sold, and the prices it paid for the certified oil were substantially lower than the standing posted prices Cities was offering in the market for such oil. For example, in one case Cities apparently found a seller offering it certified oil for $11.25 per barrel when Cities' posted price for such oil was $39.50 per barrel.

Although Cities lost money on these transactions, another feature of the regulatory scheme in place at the time enabled Cities to earn a handsome net profit. Pursuant to a DOE cost equalization program, known as the Entitlements Program, refiners with substantial access to lower cost price-controlled crude oil were required to make cash payments to refiners with limited access to such oil. Thus, the more of its price-controlled oil Cities could divest, and the more certified oil it could acquire, the higher would be its payments from other refiners. From 1979 through January 1981, these payments contributed about $147 million to Cities' profits. (Brown Aff. Exhs. 6, 7)

Gulf contends that the curious pricing of the transactions, particularly the willingness of sellers allegedly to provide Cities with certified oil for prices substantially lower than Cities was willing to pay in other transactions, is evidence that all Cities was doing was fraudulently repurchasing its own price-controlled oil with bogus certifications that the price controls did not apply. Indeed, in March 1980 Cities halted these transactions, effective in May, and undertook a study of the transactions. Wheeler testified at his deposition that the resellers were so numerous that it was impossible to prove the transactions were legitimate. (Brown Aff. Exh. 10, pp. 522–26) The Cities study identified a risk of criminal prosecution if the certifications were false.

Cities' response was to go on the offensive with a lawsuit in the U.S. District Court for the District of Delaware seeking an injunction barring DOE from prosecuting Cities, and a declaration that the trades were legitimate. The complaint was dismissed for failure to raise an issue ripe for decision and, consequently, failure to comply with the limitation of federal jurisdiction to "cases and controversies." *See* U.S. Const. Art. III. But the court did appear to accept at least *arguendo* Cities' contention that there was no real factual controversy surrounding the trades, and that the huge discounts it obtained on certified oil resulted from dealing with entities exempt from price controls. (Brown Aff. Exhs. 18, 19)

Whatever the court's reaction to the facts disclosed to it, Bam, a Cities director, was well aware in May 1980 of the weaknesses in Cities' position. He discussed them on May 29 with Wheeler and wrote a

memorandum summarizing the conversation that included the following:

> I inquired whether we could argue the doctrine of "bona fide purchaser for value" and Wheeler is uncertain about this also. As he puts it, when we buy $38 oil for $16, there is some question about how bona fide we are. My response was that if he could explain an economic justification to me whereby the owner of the $38 oil would sell it for $16, I thought I could make a case for Cities Service. We came to that later.

(Brown Aff. Exh. 8, p. 1) Bam and Wheeler also considered the possibility that the government would succeed in arguing that Cities had received false certifications, and the following schoolyard justification:

> If the matter is considered on an industry-wide basis, however, and if enough people engaged in this transactions [*sic*], there maybe a wash. If all the refiners did this to the same extent so that the entitlement costs were the same, it would be as if it never happened.

(*Id.* at pp. 5–6)

A memorandum by a Cities auditor suggests that the company was emboldened by the court's credulousness to resume trading in the fall of 1980:

> They decided to start the trading activities again because the court indicated (unofficially) that these activities would not cause the court to bring criminal or civil penalties against the Company.

(Brown Aff. Exh. 20) Bam spurred on the trading in an October 3, 1980 letter to Cities' chairman:

> Speaking for myself, I was astonished at the magnitude of the trading profits for the first half of 1980.... These ... significant numbers ... lead me to wonder whether we are getting all the mileage we can out of D.O.E. trading.... As long as we're in the game, let's try and stretch that double to a triple and then see if the runner can steal home.

(Brown Aff. Exh. 21, p. 2)

Gulf notes also that proceedings before the DOE's enforcement unit which focused on Cities' alleged violation of price regulations resulted in a September 1988 finding of liability against Cities in the amount of about $700 million, and a determination that Cities had no basis for believing it had traded with entities exempt from price regulations. It follows from the agency's conclusion that Cities' declaratory judgment action was a stratagem to secure by false representations judicial approval of trades Cities had every reason to believe were illegal, and thus to permit Cities both to diminish the likelihood that the illegality would be discovered and to assert a defense of good faith when and if the truth came out.

Gulf makes sport of Bam's unfortunate "steal home" metaphor, and no doubt would do so at trial. More importantly, however, Gulf stresses that Bam withheld his May 29, 1980 memorandum of the conversation with Wheeler until late in this case. It was only after document production deadlines had passed, including a "last call" for documents alleged to be privileged, that he submitted the memorandum to the late Charles D. Breitel, the former Chief Judge of New York's Court of Appeals who served as a special master to decide *inter alia* privilege claims in this case. Chief Judge Breitel found that Bam lacked standing to invoke the attorney-client privilege with respect to the memorandum. He relied in part on the DOE finding against Cities to conclude that the privilege was barred by the crime-fraud exception because the memorandum may have been part of an effort to mislead the Delaware court in Cities' action against DOE. In response, Cities and Bam unsuccessfully appealed, arguing that Bam had been asserting the privilege in behalf of Cities, notwithstanding that the document in question never appeared on a list of documents Cities claimed to be privileged.

This maneuvering with respect to the memorandum, if proved at trial, would strengthen Gulf's claim that Bam's conversation with Wheeler, as summarized in the memorandum, was evidence that Cities simply concocted a hypothetically lawful explanation for its oil trades, and then claimed falsely that the hypothesis was reality.

Cities' potential liability from this alleged course of conduct is substantial; Gulf's counsel has suggested a total exceeding $5.3 billion. (Brown Aff. ¶¶ 77–95) Moreover, Gulf has alleged that it was misled during its attempt to conduct a due diligence investigation incident to the proposed merger. (*Id.* at ¶¶ 96–98) Even allowing for hyperbole in the damage estimate, if any substantial part of these allegations are true, the result would be that Cities breached a material obligation of disclosure under the Merger Agreement, including for example the obligation set forth in § 7.1 to provide "all ... information concerning [Cities'] business, property and personnel as [Gulf] may reasonably request." That, in turn, would trigger Gulf's right to cancel the transaction pursuant to § 15(e) of the Tender Offer, which frees Gulf from any obligation to purchase if Cities "shall have breached in any material respects its obligations under the Merger Agreement."

Needless to say, Waidelich, Wheeler and Bam object strenuously to Gulf's assertions. Wheeler protests that the lawsuit was intended as nothing more than

> forthright conduct, shining the judicial and regulatory spotlight on these transactions, [which] would minimize any prospect that Cities might be assessed penalties, or even be accused of having acted with criminal intent, if it was later determined that our reporting of the transactions in fact had violated the ... regulations.

(Wheeler Reply Aff. ¶ 9) Waidelich, too, avers that

> The lawsuit put the spotlight on Cities. We would hardly have taken the matter public if our purpose was to mislead.

(Waidelich Reply Aff. ¶ 11) Bam, submitting his affidavit "as a matter of personal privilege," disclaims any stake in the outcome of the motion to confirm the settlement. He points out that Cities' management retained respected counsel to advise it in connection with the transactions, sought rulings, requested interpretations of DOE regulations, and suspended (at least for a time) further transactions, and that he as chairman of Cities' audit committee went further and retained counsel to investigate possible miscommunication within Cities as to the challenged transactions. He asks that I read his May 29, 1980 memorandum as "a good faith attempt by an admittedly confused director to puzzle through for the first time an extremely complex matter and to sort out the litigation risks inherent in the company's position." (Bam Aff. ¶ 3) Later on he says of the same memorandum:

> My confused attempt to analyze the economics of the trades shows that, even after the discussion with Mr. Wheeler, I still had not grasped the intricacies of the matter.

(*Id.* at ¶ 7) That is to say, Bam proffers the three somatic stigmata of good faith: the pure heart, the clean hand and the empty head.

All three affiants attack Gulf's counsel, Banks Brown, Esq., for submitting the affidavit that outlines from Gulf's perspective the facts surrounding Cities' oil trades, based on extensive documents submitted as exhibits. They aver that he has engaged in conduct beyond the bounds of proper advocacy, offended them personally, and the like.

To take the last point first, there is absolutely nothing improper about a lawyer using an affidavit as the basis for presenting documents to the court, and arguing in that affidavit what those documents show, particularly when the arguments being presented are factual ones and there is no need for a memorandum of law. If in the process Brown has trod on some gouty toes, he has done so while playing strictly according to the rules in what is, after all, litigation; it ain't tiddlywinks.

So far as Bam's avowed lack of personal interest in the outcome of the motion, it is quite plain that he has a strong interest in the outcome, as evidenced by his lawyer's close cooperation with the objectors. It is distinctly to Bam's advantage to litigate with a group of other plaintiffs providing camouflage, particularly a large group of presumptive innocents such as the class members. It is distinctly to his disadvan-

tage to litigate as a Cities insider one on one with Gulf, to cast his own conduct and that of his fellow Cities directors and officers in bold relief, and thus to tempt a jury to call down a plague on both houses.[1]

My function in evaluating the merits of Gulf's claims is limited:

> It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement.... Such procedure would emasculate the very purpose for which settlements are made. The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and exercise business judgment in determining whether the proposed settlement is reasonable.

(quoted in *Grinnell*, 495 F.2d at 462). *See also, Neuwirth v. Allen*, 338 F.2d 2 (2d Cir.1964). Applying that standard, it is sufficient to note that Gulf has adduced a good deal of evidence to support its allegations with respect to the oil trades, that such evidence was of sufficient concern to Chief Judge Breitel for him to invoke the crime-fraud exception to the attorney-client privilege, and that tales such as the one argued in Brown's affidavit, of low doings in high places, have a good measure of jury appeal. It is thus no surprise that lawyers far better acquainted than I with the underlying record would decide to settle the case, even for far less than they might have gotten after three of the best of all possible trials.

5. *Risks of Establishing Damages*

The objectors have not so much argued as assumed a substantial recovery, and why assume a loaf of bread when it is just as easy to assume the whole grocery store? In the real world, however, the path to a large damage award is strewn with hazards.

For example, the class received the benefit of a later transaction with Occidental at $55 per share. Whether those proceeds would have to be applied as a mitigating factor against claimed contract damages is an open and thorny issue. In any event, a jury that heard of such a recovery would not be tempted to exert itself in the award of damages.

Fraud damages are uncertain as well. Plaintiffs' most optimistic figure would seem to be $23 per share, the amount the stock declined—from a high of $54 to a low of $31—following termination of the offer to purchase. But how the market would have discounted Gulf's undisclosed change of heart ultimately would rest on a battle of experts, with figures available to suggest that that discount would have been as little as the $8 or $9 drop when the FTC lawsuit was announced, or perhaps even that the market in fact had discounted at an earlier date the risk that the deal would not close. This factor, too, favors compromise.

9. *Reasonableness of Settlement Compared to Possible Recovery*

Class counsel have suggested that the risks of all these factors may be weighed by applying a mathematical model: they concede for the sake of argument that plaintiffs have a better than even chance on each of five issues, with the odds 3–to–2 in their favor. The odds on success as to all five issues still would be only eight out of 100, and would favor a settlement.

But talk of odds seems more appropriate to the gaming table than to the bar of justice. This is not an aleatory exercise. Although litigation involves uncertainty, that uncertainty is not rooted in blind chance but in how jurors whose identity is unknown but who share at least certain minimum norms will react to facts known only in outline form and presented by testimony and other proof of varying appeal. If one speaks of "weighing" or "measuring" such uncertainty, those terms are being used metaphorically as a philosopher would use them, not scientifically as a chemist or statistician would.

In view of the above discussion of only some of the uncertainties attending plain-

---

**1.** *See* Wm. Shakespeare, *Romeo and Juliet*, Act III, Scene 2.

tiffs' fortunes in this case, and applying what I know of the record in this case, I believe class counsel's decision to accept the settlement at issue here cannot be rejected as unreasonable.

### III.

Although no issue has been raised as to the allocation of the settlement proceeds, I find also that the allocation plan proposed by class counsel is reasonable. The plan allocates most of the settlement to the contract claimants who tendered their Cities stock to Gulf—those directly injured by withdrawal of the tender offer, and the balance to those who purchased Gulf stock or call options. Among the purchasers, most of the proceeds are allocated to those who purchased from July 13 to July 30, who have the strongest claim, and the rest to those who purchased after July 30 when news of the FTC lawsuit and other adverse information was already at work in the market.

### IV.

As noted at the beginning of this opinion, only one objection has been raised to class counsel's fee application, and that, as discussed below, is something of an indirect attack. But that does not immunize the fee application from examination because a court in litigation such as this has a responsibility to class members, including not enforcing too rigorously the deadline for submitting objections, and making sure based on reasonable inquiry that even those who may not be able to protect themselves have been dealt with fairly. *See Weinberger v. Kendrick,* 698 F.2d 61, 69 at n. 10 (2d Cir.1982).

The objection referred to above was set forth in a letter from L.H. Wigger, received on March 31, 1992. Wigger argues that tender offerors will receive 27 cents per share while counsel will receive the equivalent of 48 cents per share, and apparently urges me to reject such a settlement as *per se* unreasonable. He claims also that counsel have received an additional $15 million in fees based on an alleged statement in an Occidental Petroleum Cor-

poration prospectus that that sum had been set aside to fight this litigation. Wigger assumes a return of approximately 27 cents per share for tender offerors, whereas the correct figure is slightly more than 48 cents, as discussed in section I. One of his apparent errors was to allocate the settlement proceeds over a total of more than 71 million shares tendered rather than prorating the settlement based on a tender offer for no more than 41.5 million shares. Another error was to conclude that class counsel shared in any proceeds from funds set aside by Occidental, if any. To date, class counsel have not received any fees in this case. Still another error was to conclude that class counsel are seeking $34 million in fees rather than approximately $10.2 million.

As class counsel point out, in cases such as this, where counsel have helped create a fund to be shared by numerous plaintiffs, courts have tended increasingly to award fees based on a percentage of the fund rather than on the lodestar calculation of time multiplied by an hourly rate. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.Ed.2d 891 (1984) (stating that in common fund cases "a reasonable fee is based on a percentage of the fund bestowed on the class...."); *Court Awarded Attorney Fees,* 108 FRD 237, 254–59 (1985) (report of Third Circuit task force recommending use of percentage calculations in common fund cases); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1296, 1306 (E.D.N.Y.1985), *aff'd in part, rev'd in part,* 818 F.2d 226 (2d Cir.1987) (criticizing lodestar approach as one that "tends to encourage excess discovery, delays and late settlements, while it discourages rapid, efficient and cheaper resolution of litigation"). The advantages of the percentage method and the disadvantages of the lodestar approach have been set forth in numerous cases and in the Third Circuit report, and there is no need to restate them here. However, it is worth adding that among the disadvantages of the lodestar approach in massive cases such as the one at hand is the tendency of its apparent precision to convey a false sense of accura-

cy and fairness. Even applying such techniques as the statistical sampling endorsed by the Seventh Circuit in *Evans v. City of Evanston*, 941 F.2d 473, 476–77 (7th Cir. 1991), it is impossible for a judge who does not undertake a full-scale audit to give reliable assurance that time has been fairly accounted for and expenses fairly incurred. In a large case, such an examination is out of the question. Because of the gap between what it seems to promise and what it delivers, the lodestar formula is undesirable if an alternative is available.

■ The 30% requested by class counsel in this case is eminently reasonable. First, it compares favorably with fee awards in other common fund cases. *E.g., In re Allstar Inns Securities Litigation*, No. 88 Civ. 9282, 1991 WL 352491 (PKL) (S.D.N.Y. Nov. 20, 1991) (awarding 35%); *Bello v. Integrated Resources, Inc.*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95731 (S.D.N.Y.1990) (awarding 30%). Second, this is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own. Third, class counsel consistently have been skillful, resourceful and diligent without also being captious—no mean feat. They invested time and money in this case, and well deserve the payment they request.

For the above reasons, the proposed settlement is approved and class counsel will recover the fees set forth in the accompanying order.

SO ORDERED.