### In re PRESIDENTIAL LIFE SECURITIES.

Nos. 92 Civ. 6968 (VLB), 92 Civ. 6977, 92 Civ. 6994, 92 Civ. 7056 and 92 Civ. 7112.

United States District Court, S.D. New York.

July 14, 1994.

Jeffrey G. Smith, Wolf Haldenstein Adler Freeman & Herz, New York City, for class plaintiffs.

Michael S. Feldberg, Lynn E. Judell, Schulte Roth & Zabel, New York City, Donald S. Snider, Anthony DeToro, Baer Marks & Upham, New York City, for defendants.

## MEMORANDUM

VINCENT L. BRODERICK, District Judge.

### I

This case involves a class action[1] brought under Section 10(b) of the Securities Ex-

1. By order dated March 28, 1994, this action was certified as a class action. The class consists of all persons and entities, other than the named defendants, their families and affiliates, who pur- chased or otherwise acquired shares of Presidential Life Corporation during the class period of March 5, 1990 through September 22, 1992.

change Act of 1934 for the benefit of current and prior shareholders of Presidential Life [2] (the "Company") who had purchased its stock at a time when accounting methods utilized by the Company for high-risk bonds had been more favorable than permitted by applicable rules as interpreted by the United States Securities and Exchange Commission ("SEC"). The SEC initiated a cease and desist proceeding on September 22, 1992, stating that it was "the first proceeding instituted by the Commission charging a financial institution with improperly accounting for its investments in high yield, junk bonds."

The four class action shareholder suits involved here followed shortly thereafter and were consolidated under 92 Civ 6898 by order dated February 10, 1993.[3] The consolidated amended class action complaint alleges that defendants concealed a material and other-than-temporary decline in the market value of the Company's investments in "junk bonds" leading to artificially inflated prices causing the class members to suffer losses as a result.

In March 1993 settlement was reached with the SEC, which entered a remedial order against the Company requiring modification of the Company's accounting practices.

This memorandum sets forth the grounds upon which I approved the settlement and the attorney's fee application in the amount of 25% of the common fund, or $418,750, plus expenses of $35,000,[4] at fairness hearing held under Fed.R.Civ.P. 23 on July 13, 1994. The principal problem presented in this litigation relates to the use of the Company's own assets to fund the settlement.

## II

"The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied sub nom Lewy v. Weinberger,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Scrutiny on this basis applies both to the negotiation process and to the resulting proposed settlement. The negotiations here appear to have been at arms-length and there is no indication of collusion. Id. at 74.

■ Guidelines for evaluating whether the settlement is fair and the class members' interests were adequately represented include the complexity, expense and likely duration of the litigation, the risks of litigation for all parties, comparison of the proposed settlement with the likely result of litigation, scope of discovery preceding settlement, the ability of the defendant to satisfy a greater judgment, and the reaction of the class to the settlement. See *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992), citing *Weinberger,* 698 F.2d at 73–74; *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 463 (2d Cir.1974); *In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986).

■ In the present case, the potential complexity of the litigation includes the presence of several novel accounting issues. The parties appear to have "a clear view of the strengths and weaknesses of their cases," *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986), based on limited but sufficient discovery, including interviewing of the defendant officer and director holding nearly one-third of the outstanding shares. The plaintiffs' claims present a number of difficult legal and factual problems, including the question of whether defendants acted with scienter and the matter of establishing damages.

The Stipulation and Agreement of Settlement (the "settlement agreement") provides

---

**2.** Presidential Life Corporation is an insurance holding company. It has approximately 28 million shares outstanding and is traded on the NASDAQ market.

**3.** Also included in these consolidated cases is a derivative action, *E.L. Greenfield v. Herbert Kurz, et. al.,* 92 Civ 7112 (VLB). The settlement agreement provides for dismissal without prejudice of the derivative action upon court approval of the settlement. There will be no recovery for the company and no payment of derivative counsel's fees by the company.

**4.** Also approved was a $10,000 incentive award to the class representatives to be paid out of attorney's fees awarded to class plaintiffs' counsel.

that $1.675 million in funds derived from the Company[5] are to be used to pay estimated losses of both current and prior shareholders who purchased the stock during the period involved. The Company had no insurance policy from which payment could be made and the individual defendants would not agree to make such payments directly. The largest single shareholder, a director and officer of the Company, owns approximately 31% of the Company's shares; he is a defendant in this action and as such is excluded from the class. He has agreed to the settlement agreement through counsel.

Impact of the settlement on the Company's stock is likely to be minimized because the settlement amount was announced in the Company's SEC 10–K filing for fiscal 1992, dated as of December 31, 1992 and filed April 12, 1993, and according to plaintiffs' counsel, there has been no discernible effect on the stock price since the announcement.

Concern on my part that the settlement could have an adverse impact on current shareholders, see part IV below, led to inclusion of all present shareholders—not merely those who were also class members—in those required to be given notice and an opportunity to be heard at the fairness hearing with respect to the settlement and to the application by class plaintiffs' counsel for attorney's fees. See Fed.R.Civ.P. 23(c)(d); Rules for the Southern District of New York, Civil Rule 5(a).

Over 7,000 notices were mailed to class members and current holders. No objections to the proposed settlement of the case have been received.[6] Many of the Company's shareholders are sophisticated institutional investors.[7] Approval by the vast majority of shareholders is entitled to considerable weight.

Under the circumstances presented in this case the compromise reached here warrants approval as fair, reasonable and adequate.

### III

Plaintiffs' counsel have requested that their attorney's fees, to be drawn from the fund created, be established based on a percentage of that fund rather than based on the often difficult-to-apply and imprecise Lodestar method involving attempts to evaluate specific numbers of hours spent and appropriate hourly rates.

■ Attorney's fees in common fund cases may be based on a "percentage of the fund bestowed on the class. . . ." *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984). Problems encountered in evaluation of fees utilizing the Lodestar approach, see *Court Awarded Attorneys Fees, Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985), have led to rejection of that method in common fund cases, *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir.1991), and express approval of the percentage method as an acceptable alternative. *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265, 1269 (D.C.Cir.1993); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.), *cert. denied*, 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *In re Washington Public Power Supply Sys. Litig.*, 19 F.3d 1291, 1296–98 (9th Cir.1994); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989).

■ I agree with counsel that the percentage approach is appropriate in this case. As noted by former Chief Judge Brieant of this court:

[A percentage fee] award is consistent with the new learning (old wine in a new bottle) announced by the Ninth Circuit in *Paul, Johnson* [886 F.2d at 272], which new learning we believe will proceed from West to East and take us back to straight contingent fee awards bereft of largely judgmental and timewasting computations of lodestars and multipliers. These latter

---

**5.** The capitalization of the Company is approximately $260 million.

**6.** Plaintiffs' counsel indicates that only two shareholders have opted out: a shareholder of one share and a shareholder who did not specify the number of shares purchased or held.

**7.** According to plaintiffs' counsel, the March 31, 1994 report filed with the SEC states that 36 institutions hold almost 32% of the company's common shares.

computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.

*In re Union Carbide Corp. Consumer Prod. Business Sec. Litig.,* 724 F.Supp. 160, 170 (S.D.N.Y.1989); see *In re Gulf Oil/Cities Service Tender Offer Litig.,* 142 F.R.D. 588, 596–97 (S.D.N.Y.1992); *In re Warner Communic. Sec. Litig.,* 618 F.Supp. 735, 749 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir. 1986); see generally 1 A. Conte, *Attorney Fee Awards* § 2.07 (2d ed. 1993).

## IV

■ The key element in assessing the reasonableness of an attorney's fee and any adjustment made in the amount requested is "the relationship between the amount of the fee awarded and the results obtained." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

Among the factors pertinent in evaluating attorney's fee awards in class action suits where the fees are to be drawn from a common fund established by the lawsuit are:

(1) The amount of work done;

(2) The risk incurred;

(3) The difficulty or complexity of the case;

(4) The benefit to the class;

(5) The benefit to the public.

See *Cranston v. Hardin,* 504 F.2d 566, 578 (2d Cir.1974); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974); *In re Warner,* 618 F.Supp. at 746–47 (S.D.N.Y. 1985).

In this case, the amount of work done was reduced by the ability of plaintiffs' counsel to rely on the ruling of the SEC in March 1993 that Presidential Life's methods of accounting for high-risk bonds exaggerated the value of such assets. The complexity of the case and plaintiffs' risk of loss were also reduced by the prior SEC action.[8] See, in comparison, *In re Gulf Oil/Cities Service,* 142 F.R.D. at 597. A private suit based on a prior regulatory action has much less value to the public interest than *de novo* inquiries.

On the other hand, counsel was required by the court to undertake additional work to explain why the settlement would be in the interest of the class as a whole notwithstanding that the funds for it were to be provided by Presidential Life rather than its officers, so that shareholder beneficiaries of the fund would be paying themselves out of the assets of their own Company.

Counsel did not incur additional fees for which compensation is sought by reason of use of multiple law firms, inasmuch as they had been informed at the outset that such additional fees would not be authorized. See *Bernstein v. Presidential Life Corp,* 1993 WL 43559, 1993 WL 43582, 1993 US Dist LEXIS 1821, 1876 (S.D.N.Y. Feb 10, 1993).

The most difficult task to be confronted in this case is the evaluation of benefit to the class and to the public.

One aspect is the seriousness of the impropriety committed by the defendant. Clearly an accounting infraction was found by the applicable regulatory agency. It was not found, however, to have reached the level of seriousness calling for criminal prosecution. Such terms as "fraud" should not be given a uniform meaning in securities cases any more than in civil RICO suits, conveying the maximum pejorative content regardless of the extent of evildoing or deliberate deception. See *United States v. Bryser,* 838 F.Supp. 124 (S.D.N.Y.1993).

---

8. Another aspect of the risks and complexity of this case is reflected in the SEC's statement that the agency proceeding here is the first such investigation charging a financial institution with improper accounting with regard to high yield, junk bond investments. The difficulty for class plaintiffs was enhanced to some extent because this was a case of first impression for the agency followed by a class action which was similarly a case of first impression for the court. Furthermore, in assessing the benefit to the public and to shareholders, culpability calling for strong deterrent action through the private attorney general function of lawsuits of this type is somewhat attenuated because the business community had not had warning provided by prior SEC enforcement in the area of accounting methods for high-risk bonds.

A copy of this decision will be sent to the SEC in the event it may become relevant to the future consideration of related issues.

Characterization of financial assets is inherently difficult, and placement of risk of carrying various types of bonds is often largely subjective.[9] Moreover, accounting itself is as much an art as a science. See Stranger & Gunther, "Big GAAP–Little Gap: Should There Be Different Financial Reporting for Small Business?," 56 NYUL Rev 1209 (1981).[10] The SEC's future-oriented regulatory action in the nature of a cease-and-desist order did not involve findings of deliberate fraud making further litigation urgent to protect the general public.[11]

Apart from the less than maximum outrageousness of the conduct involved in this case, the benefit to the public and to those class members who are current shareholders may in another respect be negative. An existing shareholder must in an economic sense pay a portion of that shareholder's own recovery out of the assets of the Company in which the stock is held. In a hypothetical case in which 100% of existing shareholders were class members, and were the only class members, and where only the Company financed the settlement, the class would in an economic sense pay 100% of the cost and receive 100% of the proceeds after deducting the legal fees awarded and other transaction costs. This would of course create a net detriment.

The effect of the cost to the Company, where the price of the stock shows no discernible change, is only one measure of this detriment. If the market does not react to the nonproductive expenditure involved in paying one's self and paying a fee for the privilege of doing so, that expenditure still reduces the ability of the entity to engage in profitable activities which will (at least on the average) produce financial benefits in the future through internal use or investment of the funds. Additional litigation has transaction costs for the courts and for society as well as for the parties and in this case some of the class members themselves which cannot be ignored. The proportion of class members who are current shareholders is critical but was not provided here, despite knowledge on the part of plaintiffs' counsel of the court's concern.

These problems might have caused me to reject the settlement were it not for the absence of objections here: all current shareholders including those not members of the class were notified of this hearing, many shareholders are sophisticated investors, and class members other than current shareholders will be benefitted by the settlement. In addition, the agreement to this settlement by a defendant who holds nearly one-third of the shares involved reduces the scope of the possibly counterproductive aspect of use of the corporate defendant's money to pay its own shareholders. Unfairness would be created in such circumstances if current shareholders who are in other respects similarly situated were omitted from the class.

Plaintiffs' counsel have requested a fee of 27.5% of the fund created. The factors outlined above would justify a reduction to 20%

---

9. Categorizing financial instruments as high-risk or low-risk or even "junk" bonds is inherently difficult and partially subjective. See *TIAA v. Coaxial Communications*, 807 F.Supp. 1155 (S.D.N.Y.1992).

10. In this case, the Company was charged by the SEC with failing to follow a generally accepted accounting principle ("GAAP") superseded in 1983. An announcement made by the accounting industry does not have an equivalent—or necessarily judicial—impact such as that of an enforcement proceeding by the SEC.

Questions are also presented concerning the extent to which private organizations controlled by the accounting profession itself should announce standards to which the business community is required to adhere regardless of expense or inherent risk of inability to comply as contemplated. See *Yakus v. United States*, 321 U.S. 414,

424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944) (Stone, CJ); Report of Special Advisory Group to Board of Trustees, Financial Accounting Fund (March 1989); Cowan, "Accounting Vote Setup is Changed," NY Times, May 23, 1990 at D1; Cowan, "Dispute Intensifies Over Job on Accounting Rules Panel," NY Times, May 22, 1991 at D4.

11. The distinction between prospective and punitive or corrective action involving failure to live up to legal norms is reflected in the flexibility provided by numerous statutes, such as the Federal Trade Commission cease-and-desist order authority under 15 U.S.C. § 45 and its ability to seek permanent injunctions under 15 U.S.C. § 53(b), as compared with criminal prosecutions for antitrust violations which may be brought by the Department of Justice under the Sherman Act, 15 U.S.C. § 1, 2.

or less, see *Weseley v. Spear, Leeds & Kellogg,* 711 F.Supp. 713, 718–19 (E.D.N.Y.1989) ("In this circuit, fees typically range from 15% to 30% of recovery" [citing cases] ); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986) (cases in the 20%–25% range and higher). However, significant additional work was imposed on plaintiff's counsel by questions put to them by the court.[12] Moreover, case law concerning partially circular recoveries in class actions is sparse and it would be inappropriate to penalize plaintiffs' counsel for failing to anticipate that this factor might reduce the net benefit flowing from the lawsuit and its settlement.

Accordingly attorney's fees of 25% of the settlement fund, or $418,750, appear to be fair and reasonable.

## V

■ Plaintiffs' counsel also seek reimbursement of expenses of $17,166.45 plus experts' fees of $27,127, totaling $44,293.45. Section IV of the notice of pendency of class action, proposed settlement and settlement hearing dated April 20, 1994 [13] stated that counsel "will seek reimbursement of out-of-pocket expenses of the litigation not to exceed $35,000." This creates a discrepancy in the present application for expenses requiring corrective action; the amount of expenses recovered is accordingly limited to $35,000.

## VI

■ Plaintiffs' counsels' request for permission to make incentive payments of $2,000 each to five of the individual class representatives is approved as set forth in the order. The matter of payments of incentives to the individual plaintiffs who acted as class representatives need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees awarded to plaintiffs' counsel. The interests of the class, of the public, and of the defendant are not directly affected. Indeed the sole reason for seeking judicial approval appears to be Code of Professional Responsibility DR 3–102 which bars splitting of legal fees with non-lawyers with exceptions not pertinent here. Such splitting may have corrupt aspects such as use of misleading representations by lay ambulance chasers in return for a share in resulting fees. See *Gorman v. Grodensky,* 130 Misc.2d 837, 498 N.Y.S.2d 249 (Sup.Ct. 1985).

Whatever the potential risk or expense of litigation which may be incurred by named plaintiffs in class actions, excessive payments of incentives in class suits based on alleged securities law violations might have the effect of creating a potential cadre of ready-to-sue clients who could afford to have sufficient stock in any number of companies to be positioned so that counsel could obtain a built-in plaintiff for any contemplated lawsuit. However, the $2,000 amount per plaintiff here is not sufficient to trigger such a concern.[14]

**SO ORDERED.**

---

**12.** An additional factor supporting a somewhat higher percentage is the agreement of plaintiffs' counsel that a $10,000 total incentive payment to the class representatives will be subtracted from the amount of attorney's fees awarded.

**13.** Approved by the court on March 28, 1994.

**14.** Absent some risk to the public, application of DR 3–102 to division of fees with the attorney's own client may be questioned. Where, however, professional groups enter into agreements which restrain trade with the purpose or effect of protecting the pocketbooks of the profession rather than protecting the public, antitrust considerations are triggered. That a licensed profession is involved does not exempt such arrangements from antitrust scrutiny. See *American Medical Ass'n v. United States,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943); *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The Bar in particular has no exemption from antitrust strictures where combinations for economic self-interest are involved. *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572

(1975); see *McGrane v. Reader's Digest,* 822 F.Supp. 1044, 1048–1050 nn. 8–10 (S.D.N.Y. 1993).