Robert T. **BECHER**, Roger Hennessey, Kenneth Hutcheson, Daniel McDiarmid, Paul Morea, Robert Pohalski, Joseph Rosato and John Thalmann, for themselves and all others similarly situated, Plaintiffs,

v.

**LONG ISLAND LIGHTING COMPANY,** Retirement Income Plan of Long Island Lighting Company and its predecessor plans, Robert X. Kelleher, MarketSpan Corporation d/b/a KeySpan Energy Corporation, Defendants.

No. 95 CV 1994(NG).

United States District Court, E.D. New York.

Sept. 17, 1999.

---

See also 129 F.3d 268.

James W. Quinn, Jeffrey Klein, Nicholas Pappas, David R. Fertig, Weil Gotshal &

Manges LLP, New York City, NY, Anthony V. Curto, Barbara S. Alesi, Curto, Barton & Alesi, Mineola, NY, for Plaintiffs.

Michael Lesch, Lorna McKenzie, Frank Cummings, Katherine S. Kamen, LeBoeuf, Lamb, Greene & MacRae, LLP, New York City, NY, for defendants.

Cynthia R. Clark, of counsel, for KeySpan.

## OPINION AND ORDER

GERSHON, District Judge.

The plaintiff class has moved for the final approval of the settlement of this class action pursuant to Fed.R.Civ.P. 23(e) on the terms set forth in the Stipulation of Settlement (or "Settlement Agreement") executed by the parties on February 19, 1999 and the Amendment to the Stipulation of Settlement executed by the parties on August 11, 1999. Class counsel has also applied for an award of attorneys' fees and reimbursement of out-of-pocket expenses. By Judgment dated August 13, 1999, I approved the Settlement and plaintiffs' application for attorneys' fees and the reimbursement of expenses. This Opinion and Order contains my reasons for that approval.

## BACKGROUND

*Procedural History*

On May 17, 1995, the plaintiffs commenced this class action on behalf of themselves and a group of long-term employees and retirees of defendant Long Island Lighting Company ("LILCO"). The Complaint sought injunctive, declaratory and monetary relief for alleged violations of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001–1461 ("ERISA"), the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301–4333 ("USERRA"), New York Labor Law §§ 193 and 198, New York Military Law § 317 and New York's common law of negligence, fiduciary duty, estoppel, fraud,

contracts and unjust enrichment. The plaintiffs' motion for class certification was granted by the Honorable Arthur D. Spatt, District Judge, to whom this case was then assigned. *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144 (E.D.N.Y.1996). By Memorandum and Order dated April 15, 1997, I granted plaintiff's motion to amend the original class certification with respect to members of the Military Subclass who had not made withdrawals. *Becher v. Long Island Lighting Co.,* 172 F.R.D. 28 (E.D.N.Y.1997). Pursuant to these orders, the class is defined as "all current and former employees of LILCO who were not credited with pension benefit service under LILCO's pension program either: (1) for service time prior to and including the date any such employee made withdrawals of contributions from the LILCO pension program prior to January 1, 1977 [the "Withdrawal Subclass"]; or (2) for time spent on military leave in or after 1940, so long as such employee had not retired from LILCO prior to January 1, 1977 [the "Military Subclass"]."

By Order dated March 16, 1999, I granted preliminary approval of the Settlement, set a date for a hearing on whether the terms of the Settlement were fair, reasonable and adequate, and directed Class Counsel to provide notice to the Class. On April 15, 1999, approximately 10,000 current employees and retirees of LILCO and/or MarketSpan, were notified by mail and newspaper publication of the terms of the Settlement Agreement. On June 25, 1999, a Supplemental Notice of the proposed Settlement was mailed to approximately 1100 additional potential class members, former employees of LILCO who had not yet retired. No class member has filed an objection to the Settlement itself. Mr. Roger Ehrler filed an objection to the Plan of Allocation and appeared at the fairness hearing held on August 12, 1999. *See infra* p. 182.

*The Terms of the Settlement*

Pursuant to the Settlement Agreement, defendants, in full settlement of the plain-

tiffs' claims, agree to: (1) grant military service credit under LILCO's Pension Plan ("Plan") to all members of the Military Subclass who (a) have taken one or more military leaves of absence after becoming employed by LILCO, (b) became or continued to be a Plan participant immediately upon return to LILCO employment following any military leave of absence, and (c) have not, subsequent to their leaves of absence, withdrawn their contributions to the Plan, and (2) create a Settlement Fund of $7,750,000, out of which disbursements to the Withdrawal Subclass will be made.

The Plan of Allocation divides the members of the Withdrawal Subclass into three groups, each of which will receive a different apportionment of the Settlement Fund. The plan provides for the distribution of at least $2,080,183.39 of the Settlement Fund to members of Group I, at least $2,386,-483.24 to members of Group II and $100,-000.00 to Group III. This Plan of Allocation allows members of the Withdrawal Subclass who fall into Group I to recover, at a minimum, 43% of the full value of their claims, members of the Withdrawal Subclass who fall into Group II to recover, at a minimum, 20% of the full value of their claims, and the remaining members of the Withdrawal Subclass, who fall into Group III, to share in a fund of $100,000, all net of the amount awarded as attorneys' fees. Group I comprises those class members who withdrew their employee contributions from the Plan prior to January 1, 1977 and who either (1) submitted a written administrative claim to LILCO's Plan Administrator in 1994 or (2) were listed as witnesses for the representative plaintiffs and were deposed by the defendants. Group II individuals differ from Group I individuals in two respects. First, they did not file administrative claims and, therefore, are subject to the defense of failure to exhaust their administrative remedies under ERISA. Second, although these plaintiffs share the same common law claims as Group I members, they made no contribution of money, time or

energy to the litigation. Group III is defined to include only those class members who (1) withdrew their employee contributions prior to January 1, 1977, and (2) retired or otherwise terminated their employment with LILCO prior to March 1, 1992. Group III members also differ from members of Groups I and II in that they were all notified in writing upon their retirement that the "Years of Credited Service" they had accrued under LILCO's Pension Plan were less than the "Years of Service" they had given to LILCO.

## DISCUSSION

*Sufficiency of Notice and Response to Notice*

Notice in a class action suit must be neutral and sufficient to alert prospective class members to the pendency and terms of the proposed settlement and to the options that are open to them in connection with the proceedings. *Handschu v. Special Services Div.*, 787 F.2d 828, 832–33 (2d Cir.1986). In addition, notice must be mailed to each class member who can be identified through reasonable effort. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

Counsel were diligent in giving notice of the settlement to potential members of the class. On April 15, 1999, approximately 10,000 current employees and retirees of LILCO and/or MarketSpan, were notified by mail of the terms of the Settlement Agreement. On April 15, 1999, a Summary Notice was also published in *Newsday* and *USA Today*. On June 25, 1999, a Supplemental Notice of the proposed Settlement was mailed to approximately 1100 additional potential class members, former employees of LILCO who had not yet retired. Notice in this case was more than adequate to comport with the requirements of due process and Rule 23.

As a result of the mailing of more than 11,000 notices with proof of claim forms, 717 persons submitted claims. Of these

claims, 532 claimants sought settlement payments out of the Settlement Fund based on their membership in the Withdrawal Subclass and 141 claimants sought credited service from the Plan based on membership in the Military Subclass. On July 22, 1999, class counsel notified forty-four claimants of the Withdrawal Subclass that their claims were disallowed because they had not withdrawn their employee contributions and, therefore, were not entitled to settlement payments. None of these individuals has objected to class counsel's disallowance of his or her claim. On August 12, 1999, class counsel notified one additional claimant of the Withdrawal Subclass, Mr. Frederick Bender, that his claim was disallowed. After being notified of this disallowance, Mr. Bender has chosen to opt out of the class. *See* Order of September 14, 1999. As for the claimants in the Military Subclass, defendants notified 18 of such claimants that their claims would be granted and notified the remaining claimants that their claims were denied. The one dispute that arose between defendants and a potential member of the Military Subclass was resolved without court intervention.

*Fairness of the Settlement*

"The law favors settlements of class actions no less than of other cases." *In re Gulf Oil/Cities Service Tender Offer Litig.*, 142 F.R.D. 588, 590 (S.D.N.Y.1992) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982)). "The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate." *Weinberger*, 698 F.2d at 73.

■ Guidelines for evaluating whether the settlement is fair and the class members' interests adequately protected are well established in this circuit. They include the complexity, expense and likely duration of the underlying litigation; the risks of litigation for all parties; comparison of the proposed settlement with the likely result of litigation; the scope of discovery preceding settlement; the ability of the defendant to satisfy a greater judgment; and the reaction of the class to the settlement. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir.1992) (citing *Weinberger*, 698 F.2d at 73–74); *In re Warner Communications Securities Litig.*, 798 F.2d 35, 37 (2d Cir. 1986); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974). The court must also examine the negotiating process that gave rise to the settlement to determine if it was achieved through arms-length negotiations by counsel with the experience and ability to effectively represent the class's interests. *Weinberger*, 698 F.2d at 74 (citation omitted).

■ Here, the court has an extensive record upon which to evaluate the fairness, reasonableness and adequacy of the Settlement. This four-year-old action is legally and factually complex and involves claims of wrongdoing going back to 1977. Massive discovery has taken place. Class counsel inspected tens of thousands of documents produced by defendants during discovery including correspondence relating to the Plan, pension benefit records, Board of Directors' minutes and collective bargaining materials; and twenty-one witnesses were deposed by the parties. The discovery process was lengthy and laborious. It required extensive proceedings under the able supervision of the Honorable Michael L. Orenstein, Magistrate Judge. Motions for summary judgment fleshed out the issues for both the parties and the court; and, following those motions, the following claims remained to be tried: plaintiffs' three common law claims for negligent misrepresentation, breach of fiduciary duty and fraudulent concealment to be tried to a jury and plaintiffs' ERISA and military law claims to be tried non-jury thereafter. The court ruled on numerous *in limine* motions directed to the scope of the evidence to be admitted at trial, and the parties submitted a comprehensive joint pretrial order and proposed jury instructions. In addition, the parties had been directed to set forth their views

regarding which issues could be submitted to the jury on a class-wide basis. On October 15, 1998, the court concluded that all liability issues could be tried to the jury as common issues.[1] However, there was a

1. Individual issues, such as issues of reliance, have been found not to bar class certification of a fraud action on the understanding that the court could conduct "separate trials" or "separate hearings" on the individual issues. *See, e.g., Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968); *Sharp v. Coopers & Lybrand*, 70 F.R.D. 544, 547 (E.D.Pa.1976). Here, "separate hearings" would not have been possible because defendants declined to waive their jury trial rights; and there is a dearth of guidance to trial courts on the case management difficulties of separately trying to a jury hundreds or thousands of individual reliance issues. In this case, the problems were avoided because I found that all issues of liability, including reliance, were common ones. In the hope that my conclusions may be of benefit to others, I here set forth my oral rulings on the liability issues:

> .... I'm going to try all of the liability issues as common issues and I'll explain why....
>
> The defendants identified several issues which they considered to be individual issues barring common trial. First .... they [claim] ... even the written disclosures would require subclasses. That argument is rejected. The defendants rely on the fact that [there are] different documents, that some documents were circulated to all employees, some were circulated to some and not others over time.... The fact is, however, and there is no real dispute from the defendants, that the content[s] of these documents insofar as the issue in this case is concerned were not materially different, whether issued at one time or another time; whether issued to one group of employees [or] all employees....
>
> The second issue that the defendants have identified as individual is the oral disclosures. The defendants rely on the fact [that] there was mandatory individual counseling and they say it was personalized and individual. Essentially, however, they have not established that the substance of those disclosures, oral disclosures, was materially different from the written disclosures. Indeed, the defendants' point throughout this case ... is that the oral disclosures and the written disclosures were materially the same. Indeed, the defendants' brief, after quoting the various excerpts from withdrawal requests from plaintiffs [argues that] the oral and written disclosures make the "clear common point" that all benefits would be lost.
>
> As I said earlier, the issue in this case is whether the plaintiffs are correct that the disclosures were required, in order not to be fraudulent, to expressly advise the plaintiffs as to the potential loss of years of service, and not just the loss of benefits based on the monetary contributions that ha[d] been made up to that point.
>
> .... [T]he "personal counseling" that the defendants rely on does not mean that the issues are not common.... The counselors dealt with the particular financial needs of individual plaintiffs. Of course those are individual, separate issues, but they are not material separate issues because they don't go to the alleged misrepresentation in this case.
>
> The defendants also rely on the fact that there were separate meetings in different places, different individual supervisors provided the counseling and so on. Again, these differences are not material to the issue in this case which is the nature of the alleged misrepresentations....
>
> .... [T]he testimony and the exhibits ... show what it was that the defendants' employees did, what guidelines they followed with regard to all representations, and the point of the whole thing is that they were to follow the disclosures that were in the written documents. I think that this is a case where there are common disclosures and that even the oral disclosures fall within that category.
>
> On oral argument, the defendants have emphasized their position that there's an individual issue because of class members' statements in their withdrawal requests. Essentially the excerpts that the defendants rely on confirm that plaintiffs said ... that they were losing all benefits, and that's what this case is about. Was that information sufficiently complete as to avoid it being misleading and inaccurate? ....
>
> The next issue is the question of reliance, and it's clear now that the plaintiffs' claims here are omission claims. Review of the pertinent state law cases as to fraudulent concealment and how that can be proved and the facts of this case as they've been proffered by the parties persuades me that the reliance issues in this case are common issues and that there's no need for separate individual hearings as to reliance.
>
> In what has become an oft cited New York Appellate decision by Justice Sandler, the Appellate Division, First Department, in *King v. Club Med.*, 76 A.D.2d 123, 430 N.Y.S.2d 65 (1st Dept.1980) rejected the claim that "allegedly individual issues of reliance" would bar class treatment of the case in the following language: "This view

is contrary to the lessons taught by judicial experience with fraud actions. It is the exceptional fraud action in which a substantial issue of reliance is presented in the face of a finding that there were fraudulent material misrepresentations and that unusual situation arises most commonly in circumstances not likely to be present here in which the person claiming fraud is alleged to have separately investigated the facts represented or is otherwise shown to have had access to the relevant information."

Again, in *Stellema v. Vantage Press,* Inc., 109 A.D.2d 423, 492 N.Y.S.2d 390 (1st Dept.1985), the Appellate Division held that it was improper for the trial court to have required each class member to individually prove reliance because reliance could be presumed.

I think it's also noteworthy that *King* and the other New York cases appear to have concluded that a presumption . . . could be applied in an appropriate case even to an affirmative misrepresentation once there's a finding that there were fraudulent material misrepresentations; whereas here only omissions are claimed, the rationale for presumption is even more compelling. In federal [securities fraud] cases the courts have addressed the rationale behind treating reliance as presumed where a material omission is established. For example, in the *Litton Indus. v. Lehman Bros. Kuhn Loeb, Inc.*, 967 F.2d 742 (2d Cir.1992), the court spoke of the fact that where the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she had been aware of the withheld information and therefore to saddle the plaintiff with proving the generally indeterminable fact of what would have happened but for the omission would be unfair. The court spoke of using the presumption which arises from considerations of fairness, policy, probability and judicial economy, citing the U.S. Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). While this is not a federal security fraud case, the reasoning of those cases comports with the state court analysis, for example in *King*, and it's persuasive. Thus, I find the plaintiffs can make a presumptive showing of reliance by a showing of material omissions and that the issue is therefore a common one.

The question then becomes whether the defendants in order to overcome that presumption have proffered any evidence that would require individualized hearings as to reliance. The defendants claim a need for such hearings on the ground that some of the plaintiffs have testified that they either did not read the booklets or that they don't remember whether they read the booklets. Defendants also refer to evidence that some plaintiffs received information through dissemination of information in the workplace or through office gossip. This type of evidence is insufficient, in my view, to establish that there are individual issues as to reliance.

As for the failure of some individuals to completely read the booklets, the defendants themselves claim that all class members had the mandatory oral counseling sessions. Thus, whether or not a particular class member read the booklets, defendants rely on oral information they provided to all class members and that information is, as I've already said in all . . . material respects, the same as the written information contained in the booklets. Therefore, according to the defendants' proffer, whether or not an individual plaintiff read the booklets, he nonetheless was aware of the information in the booklets through oral counseling sessions or as defendants also claim, through widespread dissemination throughout the workplace, and in this sense, the *Ritzer* case cited by plaintiffs, [*Estate of Ritzer v. Nat. Org. of Indus. Trade Unions*, 822 F.Supp. 951 (E.D.N.Y.1993) ], Judge Nickerson's ERISA case, [though] not directly applicable here, is instructive [insofar as he discusses the significance of dissemination in the workplace].

Similarly, that plaintiffs may have heard through office gossip the information that the defendants were disseminating does not give rise to an individual issue of reliance. The defendants do not claim that any plaintiff received information through office gossip that was different from the information that the defendants themselves disseminated. The common question is whether there were material omissions from the booklets and oral statements. There is no need for individual hearings just to establish whether or not individual class members did or did not read the allegedly inadequate booklets because even if defendants can establish that some class members did not read them reliance would not be defeated. The whole point of the plaintiffs' claim is that the material, written and oral, provided by the defendants did not contain the information necessary to make it not fraudulent. The whole point of the defense is that the material provided did sufficiently advise the plaintiffs of the results of their withdrawals. That's the fundamental dispute which the jury must decide. As suggested in *King*, in the absence of any showing that individual plaintiffs had access to the omitted informa-

further issue as to whether the plaintiffs could overcome the statute of limitations defense by establishing a continuous concealment that would support equitable tolling; whether that issue could be treated as a common issue was more problematic and further briefing was ordered. It was at that point, just weeks before the scheduled trial date of November 2, 1998, that the parties engaged in their final, successful settlement efforts through a mediator they had selected, former presiding Justice of the New York State Supreme Court, Appellate Division, Second Department, Milton Mollen.

In sum, counsel for both sides had full information about the strengths and weaknesses of plaintiffs' case and about the risks of further proceedings. The case was energetically and persistently litigated by experienced counsel, and the resulting settlement was reached on the brink of trial after arms-length negotiations before a respected neutral mediator.

If the case had proceeded to trial, plaintiffs would have faced substantial risks in proving both liability and damages. Although the court had ruled that all liability issues could be tried as common ones before the jury, the court had not yet ruled on whether the defendants' statute of limitations defense presented individual issues that had to be tried separately. Even though plaintiffs contend that they would have been able to demonstrate that their claims were not barred by the applicable statute of limitations, such a task would not have been without difficulty, especially with respect to the claims of Group III of the Withdrawal Subclass.

Even if plaintiffs had prevailed at trial, defendants indicated that they would pursue appeals. The settlement guarantees the aging plaintiff class immediate relief. Were the action to continue to be litigated, even if plaintiffs ultimately were successful, they could wait years before obtaining any relief.

The absence of any objection by class members, except for one objection to the Plan of Allocation, evidences the class's overwhelming support of the Settlement. The absence of objection is particularly notable here since over 11,000 potential class members were individually notified by mail of the Settlement, including the Plan of Allocation. The overall settlement represents a significant success for the entire class especially given the age of the claims and the difficult statute of limitations problems, both substantive and procedural, facing the plaintiffs. However, as guardian of the rights of absent class members, the court must carefully scrutinize the Plan of Allocation for it gives substantially more benefits to some plaintiffs than to others.

■ Group I is comprised of the named plaintiffs and other class members who actively assisted in the prosecution of this case. Sixty-seven of the sixty-nine members of Group I filed administrative claims with the Plan administrator, contributed $1000 each to this litigation at the outset and entered into fee agreements with class counsel by which class counsel agreed to represent the class. The members of Group I also agreed to fully assist in the prosecution of the case. The two members of Group I who did not file administrative claims or contribute $1000 to the litigation made substantial contributions to plaintiffs' case by, among other things, making themselves available to class counsel throughout the course of the litigation, testifying on behalf of the Class at their depositions and agreeing to provide critical testimony at trial. Finally, all sixty-nine members of Group I subjected themselves and their careers to significant risks in promoting the claims of the class. Mr. Becher, a named plaintiff and a member of

tion or could have ascertained it—and there is no such claim here—there's a common question and no need for individualized hearings on reliance.

10/15/98 Tr. at 57–65.

Group I, spoke compellingly about such risks at the fairness hearing held on August 12th. And, Mr. Robert Ehrler, who filed the sole objection to the Plan of Allocation, while nonetheless agreeing to the settlement [2], substantiated plaintiffs' position by acknowledging at the fairness hearing that, although aware that he could have become a named plaintiff at the inception of the litigation, he chose not to do so because he was concerned about the negative impact his involvement in the litigation might have on his career. Courts have frequently recognized such factors—the contributions of some class members to the litigation and the risks undertaken by them—as sound bases for enhanced recoveries. *See, e.g., Selzer v. Bd. Of Educ. Of the City of New York,* No. 82 CV 7783, 1993 WL 42787, at *3–5 (S.D.N.Y. Feb. 16, 1993); *White v. Nat'l Football League,* 822 F.Supp. 1389, 1406 (D.Minn. 1993), *aff'd,* 41 F.3d 402, 408 (8th Cir. 1994); *Lo Re v. Chase Manhattan Corp.,* No. 76 CV 154, 1979 WL 236, at * 6 (S.D.N.Y. May 25, 1979). Insofar as Mr. Ehrler raised concerns at the fairness hearing about the allocation of only $100,000 to members of Group III (only 145 of whom filed proofs of claim), the claims of members in this group would have been subject to substantial difficulties of proof at trial, particularly with respect to defendants' statute of limitations defense. Indeed, there existed a significantly greater risk of non-recovery for these individuals than for the members of Groups I and II.

Taking all these considerations into account, I am satisfied that the Plan of Allocation's distinction among the three groups is fair and reasonable.

*Attorneys' Fees and Expenses*

■ Plaintiffs' counsel entered into a contingency fee arrangement for one-third of the recovery with the sixty-seven original claimants in this case and now seek that amount, $2,583,333, under the com-

mon fund theory. This amount was well-earned and is easily approved under either the conventional lodestar method, *see Grinnell Corp.,* 495 F.2d at 468, 471, or as a percentage of recovery, an approach well-suited to this case, in which settlement occurred after full development of the facts. *See, e.g., In re Medical X–Ray Film Antitrust Litig.,* No. 93 CV 5904, 1998 WL 661515, at *6–*7 (E.D.N.Y. August 7, 1998); *cf. Savoie v. Merchants Bank,* 166 F.3d 456, 460–61 (2d Cir.1999) (declining to address viability of percentage-of-recovery method where facts did not support its application). Class counsel have calculated their base lodestar as $3,904.173.50, a figure that far exceeds the fee request currently sought by class counsel. Indeed, the one-third of the Settlement Fund that class counsel now seek in fees represents only 66% of class counsel's straight lodestar. Similarly, using the percentage of recovery method, class counsel's requested fee, which represents one-third of the Settlement Fund, appears reasonable and is well within the range accepted by courts in this circuit. *See, e.g., Klein v. PDG Remediation, Inc.,* No. 95 CV 4954, 1999 WL 38179, at * 4 (S.D.N.Y. Jan.28, 1999) (33%); *In re Medical X–Ray Film Antitrust Litigation,* 1998 WL 661515, at *7 (33 1/3%); *In re Crazy Eddie Securities Litig.,* 824 F.Supp. 320, 326 (E.D.N.Y.1993) (33.8%).

Class counsel spent over 16,000 hours investigating and litigating plaintiffs' claims, which were factually and legally complex, without the benefit of a prior government litigation or investigation. Class counsel's masterful efforts in the face of a vigorous and tenacious defense culminated in the current Settlement Fund of $7,750,000 for the Withdrawal Subclass and full relief for the Military Subclass, a superb result for the class. For all these reasons, class counsel's fee request of

---

2. Mr. Ehrler has submitted a claim form in which he accepted the settlement, chose not to opt out and released all of his claims against the defendants in consideration for the payments to which he is entitled under the Settlement Agreement.

$2,583,333.33 is hereby approved as fair and reasonable.

Class counsel also seek reimbursement for the $486,548.79 in out-of-pocket expenses they incurred during the course of the litigation. A review of the Joint Fee Affidavit and its accompanying exhibits persuades me that this request is also fair and reasonable and, thus, it is approved.

## CONCLUSION

For the foregoing reasons, the Settlement and plaintiffs' application for attorneys' fees and the reimbursement of expenses are approved.

**SO ORDERED.**